UNITED STATES of America,

v.

John BUETTNER–JANUSCH, Defendant.

79 Cr. 0710–CLB.

United States District Court,
S. D. New York.

Oct. 29, 1980.

Kostelanetz & Ritholz, New York City (Jules Ritholz, Frank L. Amoroso, William B. Wachtel, New York City, of counsel), for plaintiff.

John S. Martin, Jr., U. S. Atty., by Roanne L. Mann, Asst. U. S. Atty., New York City, for defendant.

## MEMORANDUM AND ORDER

BRIEANT, District Judge.

On July 16, 1980, following a trial by jury, the Defendant, John Buettner–Janusch, was convicted of (1) conspiracy to manufacture and distribute and possess with intent to distribute certain controlled substances (21 U.S.C. §§ 812, 841(a)(1), 841(b)(1)(B) and 841(b)(2), ("Count One"); (2) actual manufacture and possession of methaqualone with intent to manufacture and distribute (21 U.S.C. §§ 812, 841(a)(1), 841(b)(1)(B) and 18 U.S.C. § 2), ("Count Two"); (3) knowingly making false statements to Government investigators (18 U.S.C. § 1001), ("Counts Five and Six"). He was found not guilty by the jury of distribution and possession with intent to distribute a quantity of Cylert pemoline (21 U.S.C. §§ 812, 841(a)(1) and 841(b)(2), ("Count Three") and acquitted by the Court of conspiracy to obstruct justice (18 U.S.C. §§ 371, 1001, 1503 and 1510), ("Count Four").

By motion filed September 16, 1980, the Defendant moves, pursuant to Rule 29(c), F.R.Crim.P., for a judgment of acquittal notwithstanding the verdict. In support of this motion the Defendant argues that the evidence on Counts One, Two, Five and Six was insufficient for a reasonable jury to find guilt beyond a reasonable doubt. In the alternative, the Defendant seeks an order pursuant to Rule 33, F.R.Crim.P., granting him a new trial. The Defendant challenges the verdict as against the weight of the evidence and specifies trial errors which he claims denied him a fair trial.

■ Upon considering the Defendant's contentions in light of the applicable standards, the Court denies both motions. The Court finds that the evidence presented at trial is more than sufficient to sustain the verdict. There was adequate proof in the record from which a reasonable jury could find guilt beyond a reasonable doubt. *See Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1941). Nor has the Defendant succeeded in satisfying the lesser standard for the grant of a new trial. Neither the claim that the verdict is against the weight of the evidence nor the alleged trial errors require a new trial "in the interests of justice." *See* 8A Moore, Federal Practice ¶ 33.02 (rev. ed. 1980).

### a) *Count One*

In addition to a general verdict on Count One, the jury answered three questions on a Special Verdict in the affirmative indicating that they found the Defendant guilty of conspiring to manufacture, distribute and possess with intent to distribute each of the three controlled substances charged in the indictment, namely, Lysergic Acid Diethylamide ("LSD"), Methaqualone, and Barbitol (Sodium Barbitol).

Regarding the conspiracy to manufacture, distribute and possess with intent to distribute LSD, the Defendant first argues that the physical evidence introduced at trial negates the existence of any conspiracy. Government Exhibit 35, a note written by Dr. Buettner–Janusch was purportedly introduced to show the second step in the manufacture of LSD. Contrary to the Defendant's contentions, however, the fact that the note by chemical symbol expressed a direction for the use of nitric acid rather than nitrous acid does not conclusively establish that the Defendant was not attempting to manufacture LSD. The weight and significance of this discrepancy presented an issue to be determined by the jury. The second tangible piece of evidence the Defendant challenges concerns diethylamine, an essential ingredient in the manufacture of LSD. Defendant claims that the only tangible evidence of the presence of this chemical in the laboratory was a photograph of one sealed bottle and an invoice showing delivery of two bottles on May 12, 1977. (Govt.Ex. 33K.) This evidence shows that those bottles of diethylamine were present in the laboratory. It does not compel an inference that all was used earlier. There was testimony from the Government chemist, Weber, as to the small amount actually necessary. (Tr. 1367–68). Nor

does this tangible evidence negate Dr. Buettner–Janusch's admissions to Mr. Dorfman, for example, that he was going to make LSD (Tr. 118) and that LSD in plain view on May 17, 1980 was a decoy and the real LSD was hidden in the cold room (Tr. 155). Although the defendant claims that the Government has, at best, proven only the passive receipt of statements as to the Defendant's intention to make LSD with the aid of the co–conspirator, the existence of an agreement need not be proven directly but may be inferred from such statements and subsequent joint participation in the venture. See United States v. Taylor, 562 F.2d 1345, 1352 (2d Cir.), cert. denied sub nom. Salley v. United States, 432 U.S. 909, 97 S.Ct. 2958, 53 L.Ed.2d 1083 (1977); United States v. Varelli, 407 F.2d 735, 741–42 (7th Cir. 1969).

■ Defendant contends that the evidence regarding a conspiracy pertaining to barbitol and methaqualone is insufficient because it is based upon the testimony of Mr. Dorfman and Mr. Cornyetz. His first argument is that such "vague, sketchy and dubious testimony of involved and implicated parties, is, as a matter of law, an insufficient basis for a verdict of guilt." (Deft. Br. 15.) There may well come a point where, as the Defendant contends, any number of witnesses considered alone or together are so incredible and unreliable that their testimony cannot as a matter of law constitute sufficient evidence upon which a reasonable jury could base a guilty verdict. That is not, however, the situation in this case. Such a conclusion is not an inference compelled because the witnesses initially gave testimony exculpatory to Defendant, received immunity, and then recanted and testified for the Government. Many successful prosecutions depend on the testimony of former accomplices and co–conspirators. Such persons usually give varying accounts of their own activities as the investigation progresses. What the law does require is that such exculpatory statements of government witnesses be disclosed to the Defendant, see United States v. Agurs, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976); Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and that the jury be informed of all agreements or deals between the Government and such accomplice witnesses. Thereafter, their credibility is for the jury, unless they are so depraved and uncorroborated that no reasonable juror could believe their testimony. At this trial, the jury was instructed in the approved fashion that, in considering the credibility of Mr. Dorfman and Mr. Cornyetz, it should recognize that, by their own testimony, they were accomplices whose testimony must be viewed with caution. (Tr. 2065–68.)

■ Defendant's second argument is that the testimony of these two witnesses, Dorfman and Cornyetz, is tainted by the use of illegally–seized evidence in questioning these witnesses. Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). The Defendant refers specifically to the barbital seized on August 2, 1979 from the basement storage area and chemical precursors of LSD seized on May 17, 1979. These illicit items were suppressed by this Court. (Deft. letter, September 22, 1980.) Considering the factors enunciated by the Supreme Court in United States v. Ceccolini, 435 U.S. 268, 98 S.Ct. 1054, 55 L.Ed.2d 268 (1977), I find there is a sufficient attenuation between the illegally–seized evidence and the testimony of these two witnesses at trial. The suppressed evidence was relatively minor in comparison to the evidence lawfully obtained by the Government from the laboratory. The Government has demonstrated that the identity of Mr. Cornyetz was known prior to the May 17, 1980 search and that seizure of ergotamine tartrate was not used in questioning him or seeking to obtain his cooperation. Likewise, no mention was made of this evidence during the negotiations which resulted in Mr. Dorfman's cooperation. (Affid. of AUSA Roanne L. Mann, filed October 1, 1980.) The Government has also demonstrated that it had knowledge of the presence of these substances in the laboratory independent of the seizures. (Affid. P. 3.) Recognizing that "the exclusionary rule should be invoked with much greater reluctance where the claim is based on a causal relationship between a constitu-

tional violation and the discovery of a live witness than when a similar claim is advanced to support suppression of an inanimate object," 435 U.S. at 280, 98 S.Ct. at 1062, the Court concludes that the testimony was properly admitted at trial.

### b) *Count Two*

Count Two of the indictment charged the Defendant manufactured and possessed with intent to distribute methaqualone. The Defendant's argument in support of the motion is based on the provenance of the methaqualone introduced at trial. The Government introduced six plastic jars containing methaqualone in various stages of purification that were seized from the Defendant's laboratory during the Government search on May 17, 1980. Evidence of the "melting points" of the substances recorded in the laboratory notebook by Cornyetz on May 17th was introduced and compared with the melting points of the substances seized by the Government as computed by a chemist of the Drug Enforcement Agency following such seizure. Defendant's argument relies on the opinion testimony of his expert witness, Dr. Arthur Rosenthal, that the substances introduced at trial were not the same substances in the laboratory on the afternoon of May 17, 1979. Defendant's argument assumes the accuracy of Cornyetz's tests and argues that the DEA's tests were likewise accurate. From these assumed facts we are asked to infer that the witness Jolly, contrary to his sworn testimony at trial and in the suppression hearing, fabricated these exhibits after Cornyetz ran his tests and before the DEA ran its tests. This dispute is merged in the verdict. Our jurors were adequately situated to resolve the credibility of the witnesses. The trial record neither permits nor requires a finding by the Court that Prof. Jolly, rather than the conspirators, made the methaqualone seized in the laboratory, or that these exhibits "could not possibly be" the same substances tested by Cornyetz under Defendant's personal supervision on the afternoon of May 17, 1979, and accordingly, that a reasonable juror acting reasonably could not find guilt beyond a reasonable doubt. Nor is it contrary to the weight of the evidence.

### c) *Count Five*

Defendant includes Count Five in his motion for a judgment of acquittal based on the insufficiency of the evidence. No further reference has been made to Count Five, however, in the Defendant's Brief or subsequent submissions to the Court. There was ample evidence produced at trial from which a reasonable jury could find that, contrary to his representations to an Assistant United States Attorney, Dr. Buettner–Janusch was aware that methaqualone was a controlled substance.

### d) *Count Six*

We note initially that, although the Defendant "argued vigorously and repeatedly that Count Six was duplicitous" (Deft.Supp. Br. 7), he failed to move during the trial for the withdrawal of any defective specification. The Government urges that such failure may well preclude a post–trial claim of insufficiency. *See United States v. Bonacorsa*, 528 F.2d 1218, 1222 (2d Cir.), *cert. denied*, 426 U.S. 935, 96 S.Ct. 2647, 49 L.Ed.2d 386 (1976). The Court does not rely on this contention. Legal questions in criminal trials should be resolved on the merits, and the Court never perceived that this Defendant intended to or did abandon any of his pre–trial contentions.

Defendant claims that because the Count is duplicitous, the jury verdict is legally insufficient if the proof at trial was insufficient as to *any* statement. This Court has previously ruled that Count Six charged "multiple means constituting a single and continuing offense." (Memo. & Order, March 27, 1980.) The jury was instructed that it could properly find guilt beyond a reasonable doubt only if it was unanimous as to the wilful falsity of at least *one* of the statements and also unanimous as to which one. (Tr. 2117.) *See United States v. Bonacorsa, supra; United States v. Edmondson*, 410 F.2d 670, 673 n.6 (5th Cir. 1969); *Arena v. United States*, 226 F.2d 227, 236 (9th Cir. 1955).

There was sufficient evidence from which the jury could conclude beyond a reasonable

doubt that the Defendant wilfully answered falsely. Any claim of imprecision or ambiguity in the prosecutor's questions, and any issue of what interpretation this intelligent, educated and fluent Defendant placed on the questions, presented factual issues for the jury to decide. *See United States v. Corr*, 543 F.2d 1042, 1049 (2d Cir. 1976). The Court also adheres to its prior determination that the answers are not legally insufficient as a matter of law to constitute a violation of 18 U.S.C. § 1001.

### Claimed Errors at Trial

■ We now consider the claims of error at trial or prosecutorial misconduct that Defendant asserts warrant a new trial. Over objection by Defendant, the Court received the testimony of Prof. Dale Eichelman, Defendant's academic subordinate at New York University, regarding a conversation in August, 1979 during which the Defendant urged that Eichelman not write a requested letter of reference for Mr. Cornyetz to this Court (Judge Lowe), to be used in mitigation of punishment for his own participation in the conspiracy. This testimony was properly admissible as evidence of consciousness of guilt. Consideration of the standards enunciated in Rule 403, F.R.Evid. did not require its exclusion. The motivation of the statement by Defendant to Prof. Eichelman, a jury could find, was to forestall a favorable letter to which the Government's cooperating individual, Cornyetz, was presumably entitled, and thereby indicate to that potential witness the power which Defendant possessed in academic circles, and his ire brought on by the fact that his co–conspirator had shifted loyalties from the Defendant to the Government. Accomplice witnesses, probably as a natural result of their inherently dissolute character, often cooperate only intermittently, shifting their loyalties back and forth between the Government and their former partners in crime. By his statement to Eichelman, Professor Buettner–Janusch sought to impede the efforts of the Government to keep Cornyetz cooperating until trial. Although a cooperator may believe otherwise, the Government, at least in this district, had no effective control over what Cornyetz's sentence would be. Failure to get the letter to which he was entitled might have led to a more stringent sentence for Cornyetz, which he would interpret as a breach of faith and cease cooperating.

■ Defendant also challenges the admissibility of Government Exhibit 18 and 18A, a tape recording of the June 5, 1979 conversation between Mr. Macris and Mr. Cornyetz. Prior to the playing of this tape, the jury was instructed that the tape was being received subject to connection on Count Four only, which charged Professor Buettner–Janusch with a conspiracy to obstruct justice. The trial jury was told specifically that because the Defendant was not a participant, it was not admissible on Count One, but available only on Count Four, and also in evaluating Mr. Cornyetz's credibility. (Rule 801(d)(1)(B) F.R.Evid.) The jury was expressly and clearly cautioned that the conversations were being taken only for these two limited purposes. (Tr. 491.) The jurors were also admonished not to consider *any* of the statements made by Mr. Macris on the tape because he was no longer a member of any conspiracy under either Count when the conversation took place. (Tr. 493.) The Court ultimately dismissed Count Four. As the jury had been instructed *prior to hearing the tape*, that it could not consider it as evidence on Count One, it remained available only insofar as it assisted in weighing Cornyetz's credibility. Additionally, to the extent that the tape may have contained prior inconsistent statements of Cornyetz, the Government was entitled to elicit that adverse information on direct examination as bearing on his credibility, *without awaiting its possible use by Defendant on cross–examination.*

In reliance on *United States v. Geaney*, 417 F.2d 1116 (2d Cir. 1969) and its progeny, Defendant urges that there "was not a fair preponderance of the evidence with respect to the conspiracy * * * * independent of hearsay declarations of co–conspirators, to allow the admission into evidence of statements by co–conspirators pursuant to

Rule 801(d)(2) F.R.Evid." (Deft.Mot. p. 3.) We commence our discussion by noting that the sworn testimony of co–conspirators (accomplices) who testify at trial to the acts which the defendant himself committed in their presence, and statements he made in their presence, as well as adoptive admissions by Defendant resulting from Defendant's silence when events were taking place or words being spoken in his presence in furtherance of the conspiracy, are not hearsay.

The *Geaney* case concedes that the discussion "relates only to utterances whose receipt in evidence would otherwise be banned by the hearsay rule" and that " 'Acts' of the other conspirators stand on quite a different basis." 417 F.2d at 1120 n.3.

The relevant portion of *Geaney* relied upon is found at page 1120, where the Court of Appeals said:

"While the practicalities of a conspiracy trial may require that hearsay be admitted 'subject to connection,' the judge must determine, when all the evidence is in, whether in his view the prosecution has proved participation in the conspiracy, by the defendant against whom the hearsay is offered, by a fair preponderance of the evidence independent of the hearsay utterances. If it has, the utterances go to the jury for them to consider along with all the other evidence in determining whether they are convinced of defendant's guilt beyond a reasonable doubt. If it has not, the judge must instruct the jury to disregard the hearsay or, when this was so large a proportion of the proof as to render a cautionary instruction of doubtful utility, as could well have been the case here, declare a mistrial if the defendant asks for it. Since we must assume on appeal that the trial judge was satisfied of the existence of a conspiracy on the basis of non–hearsay evidence the question becomes whether he had reasonable grounds to be so."

*Geaney* does not hold that the trial judge must engage in some meaningless recital of some sort of litany which would show that he has read and considered the *Geaney* case,

and has reached the conclusion that the hearsay utterances are admissible. Nor does Rule 104 F.R.Evid. require such a procedure. Failure to strike hearsay offered subject to connection under the *Geaney* rule, followed by a submission of a conspiracy count to the jury, must be read to constitute an implied finding that the Government has proved the existence of the conspiracy at least by a preponderance of the credible non–hearsay evidence, and that Defendant and the hearsay declarant were members of it. The post–*Geaney* case of *United States v. Valencia,* 609 F.2d 603, 631 (2d Cir. 1979) holds that the *Geaney* ruling (if it is still required to be made in view of Rule 104 F.R.Evid.) may be made "implicitly when the Court admitted the statements over the defenses objections."

The intellectual basis of the *Geaney* opinion is derived from Judge Hand's famous opinion in *United States v. Dennis,* 183 F.2d 201, 230–231 (2d Cir. 1950), *aff'd* 341 U.S. 494, 71 S.Ct. 857, 95 L.Ed. 1137 (1951). The *Dennis* case, and its predecessor *United States v. Renda,* 56 F.2d 601, 602 (2d Cir. 1932), a *per curiam* opinion, determined, in the *Geaney* decision, also to have been written by Judge Hand, assume that membership in a conspiracy by the Defendant on trial may be proved on an entire trial record, including the hearsay utterances admitted by the trial Court, once the trial Court had been satisfied that the *Geaney* threshold for admissibility had been attained.

The writer, with due respect to the memory of the great Judge Hand, has always had misgivings about the use of co–conspiratorial hearsay to prove membership of the Defendant on trial in a conspiracy. Accordingly, in this case, and in a large number of prior cases, this Court has charged the jury, usually without any exception by the Government, and without any comment on the part of various appellate reviewing panels, that:

"I caution you that in determining whether a conspiracy existed, you should consider the acts and declarations of all the alleged participants. However, in de-

termining whether this defendant was a member of the conspiracy, you must consider only his acts and statements and not what some others may have said or done. He cannot be bound by the acts or declarations of other participants unless it is established that a conspiracy existed and he was one of the conspirators."

(Tr. pp. 2091–92.)

This is approved jury instruction and legal theory followed in the First and Third Circuits. It is commanded by logic and fairness. For an interesting discussion of this point, see Koeltl & Tuerkheimer, *Judge Weinfeld and the Criminal Law: The Keogh–Kahaner Trial–A Case Study in Criminal Justice*, 50 N.Y.U.L.Rev. 1008, 1034–39 (1975). We note in passing that long after *Geaney* was decided, the Federal Rules of Evidence became effective on July 1, 1975. In that new code, the admissibility of the hearsay statements of a co–conspirator was codified, by a legislative finding that such statements are *not hearsay*. Like Humpty Dumpty in "Through the Looking Glass," a legislative body, when it uses a word such as "hearsay," can make that word mean what it wants it to mean. Rule 801(d)(2)(e) provides that "a statement is not hearsay if * * * * the statement is offered against a party and is * * * * (e) a statement by a co–conspirator of a party during the course and in furtherance of the conspiracy."

Much of the discussion on this point appears to be academic in the context of the Buettner–Janusch trial. The co–conspirators Cornyetz and Dorfman actually testified and were available for cross–examination. In retrospect, the Court cannot think of any hearsay statements of Greenfield, who did not testify, which were probative of Buettner–Janusch's guilt or more than merely cumulative. None are cited in the post–verdict motion.

No error is perceived with respect to the receipt of hearsay declarations in this trial.

■ Defendant also claims that improper remarks by the prosecutor during her summation deprived him of his right to a fair trial. The prosecutor referred to the failure of the Defendant to call Dr. Elwyn Simons, the director of Duke's lemur facility, to support his factual theory that he was manufacturing drugs not for street use, but solely in connection with his highly scientific lemur research, which necessitated a higher quality dope than concededly available from prestigious licensed manufacturing chemists required to adhere to purity standards of the United States Pharmacopoeia.[1]

This Court is satisfied that the Assistant United States Attorney believed that she was within the limits of lawful comment when she made the remarks complained of. On this point the Government relies on *United States v. Barnes*, 604 F.2d 121, 148 (2d Cir. 1979) and *United States v. Bubar*, 567 F.2d 192, 199 (2d Cir. 1977). This Court does not agree that the remark was a proper remark, but I am satisfied that it was sincerely uttered, with reliance on a good–faith belief that it was proper argument under the cases mentioned above, and that there was no intention to strike a low blow on the part of the Government. Nor was it necessary because no reasonable juror could have put much stock in the lemur research claim. In his post–verdict motion Defendant has escalated this claimed impropriety beyond the significance, if any, to which it is entitled in the context of the entire trial record. Accordingly, we quote a substantially complete version of the entire argument complained of.

---

1. Methaqualone, commonly sold under the trade name Quaalude, is a prescription drug manufactured by one or more manufacturing chemists according to federal quality control standards found in the United States Pharmacopoeia. Their manufacturing facilities and personnel are probably better adapted to producing a consistently high quality product, than are those of the New York University Anthropology laboratory. Furthermore, the conspira-

tors in this case purchased enough raw materials to make sufficient methaqualone to zonk out all the lemurs in the United States and keep them in a perpetual state of euphoria. It is a tribute to the Defendant's audacity that he is able to assert this claim with a straight face, and has been successful in having his friends and associates believe it, and support him in his attempt to prove its validity.

"Ms. Mann: But if there was any truth to/the defendant's cover story, then, ladies and gentlemen, I submit to you that there was one man who would have had firsthand knowledge of the defendant's lemur project, and that was Dr. Elwyn Simons, the director of Duke's lemur facility. Because, ladies and gentlemen, if Buettner–Janusch was really making drugs to use on Dr. Simons' lemurs, he certainly would have talked to Dr. Simons, he would have obtained his approval before he started making pounds of the stuff in his laboratory. But, ladies and gentlemen, the one scientist that Buettner–Janusch did not bring to this courtroom was Elwyn Simons.

Mr. Ritholz: Your Honor, I beg your pardon.

The Court: Strike out that argument. I will instruct the jury at this time that the defendant does not have to prove his innocence. The duty of proving guilt beyond a reasonable doubt is a burden the government has. It remains with the government at all times during the trial and during your deliberations in the jury-room.

Furthermore, this doctor was equally accessible by subpoena to anyone, including the United States Attorney.

So I am striking out that argument. It is an improper argument that has no basis. Put it out of your minds.

Mr. Ritholz: I make a motion for a mistrial.

The Court: Your motion for a mistrial is denied on that ground. I gave my instruction.

Ms. Mann: Your Honor, you know from the evidence presented during this trial that Elwyn Simons was never told about this project.

The Court: He is stricken out of your discussion.

Ms. Mann: Your Honor—

The Court: You listen to me unless you want a mistrial. No more about Simons. He was equally accessible."

The Court believes that these instructions were adequate to cure any error resulting from the improper argument. The Court's position on this point was reiterated fully in the jury charge where it was clearly emphasized that the Government had the burden of proof beyond a reasonable doubt that the Defendant was presumed innocent and did not have to prove his innocence.

■     The defendant also claims that the prosecutor improperly placed the Government's credibility in issue. In her rebuttal summation, the prosecutor responded to the defense attorney's summation argument that the Government got Mr. Dorfman and Mr. Cornyetz to lie, by arguing that if the jury believed "the government is participating in a frame of this man . . . then walk right out of the jury room and return a verdict of not guilty." (Tr. 2035.) A prosecutor should not bolster a case by placing the prestige of the Government behind the credibility of its witnesses. In this case, the prosecutor's brief reference was made in response to an argument chosen by the Defendant. Under these circumstances, the prosecutor was entitled to respond to the defense contention and her statement was not prejudicially improper. *See United States v. Stassi,* 544 F.2d 579, 585 (2d Cir. 1976), *cert. denied,* 430 U.S. 907, 97 S.Ct. 1176, 51 L.Ed.2d 582 (1977); *United States v. Brawer,* 482 F.2d 117, 133–34 (2d Cir. 1973), *cert. denied,* 419 U.S. 1051, 95 S.Ct. 628, 42 L.Ed.2d 646 (1974); *United States v. LaSorsa,* 480 F.2d 522, 525–26 (2d Cir.), *cert. denied,* 414 U.S. 855, 94 S.Ct. 157, 38 L.Ed.2d 105 (1973).

For the foregoing reasons the Defendant's motions for a judgment of acquittal or a grant of a new trial are denied.

So Ordered.