UNITED STATES of America, Appellee,

v.

John BUETTNER–JANUSCH,
Defendant-Appellant.

No. 876 Docket 80–1430.

United States Court of Appeals,
Second Circuit.

Argued March 5, 1981.

Decided April 6, 1981.

the investigation. We are thus faced with the difficult task of evaluating the power of third parties to permit governmental intrusion into an area which a defendant reasonably regards as private. We are of the view that the circumstances present here confirm that Macris and Jolly had the requisite authority. Accordingly, we agree with Judge Brieant that the Government's conduct did not violate the Fourth Amendment.

Roanne L. Mann, Asst. U. S. Atty., S. D. N. Y., New York City (John S. Martin, Jr., U. S. Atty., Robert S. Litt, Asst. U. S. Atty., New York City, of counsel), for appellee.

Peter L. Zimroth, New York City (Jules Ritholz, Stuart E. Abrams, Kostelanetz & Ritholz, New York City, of counsel), for defendant-appellant.

Before KAUFMAN and TIMBERS, Circuit Judges, and WARD, District Judge.*

IRVING R. KAUFMAN, Circuit Judge:

This case chronicles the tragic culmination of the career of Dr. John Buettner-Janusch, one of the world's leading authorities on physical anthropology. The Government established that Dr. Buettner-Janusch, in violation of both the criminal law and his duty to the academic community, manufactured illegal drugs in his laboratory at New York University ("NYU"). Buettner-Janusch's illicit activities were first brought to light by the private investigative work of his undergraduate research assistant, Richard Macris, and a fellow Professor of Anthropology, Dr. Clifford Jolly. This appeal derives its legal significance from the Government's response to Macris's and Jolly's contentions. Deciding to eschew the customary procedure of securing a warrant to search the defendant's laboratory, the Government relied instead on the apparent authority of Macris and Jolly to consent to

I.

Because the constitutionality of an allegedly unlawful search depends to a large degree on underlying circumstances, we must set out the facts in some detail.

A grand jury filed a six count indictment on October 3, 1979, charging Buettner-Janusch with: conspiracy to manufacture and distribute LSD, methaqualone, and other controlled substances; manufacturing and possessing with intent to distribute approximately 1.2 kilograms of methaqualone; distributing and possessing with intent to distribute cylert pemoline, a controlled stimulant; conspiracy to obstruct a criminal investigation, and, in counts 5 and 6, knowingly making false statements to two Assistant United States Attorneys. Shortly thereafter, Buettner-Janusch moved to suppress certain evidence seized from his laboratory on May 17, 1979 by agents of the Drug Enforcement Administration (DEA). Judge Brieant filed three comprehensive opinions, in which he summarized five days of evidentiary hearings and discussed all of the defendant's claims.

These hearings established that in 1973, Buettner-Janusch relinquished his position as Professor of Anthropology at Duke University to become Chairman of the Anthropology Department at NYU. To accommodate the defendant's research, and to house the equipment he had brought with him from Duke,[1] the University remodeled a

---

* Of the United States District Court for the Southern District of New York, sitting by designation.

1. One of the items of equipment Buettner-Janusch transported from Duke was a fume hood, a glass walled enclosure designed to prevent toxic gases from escaping into the laboratory.

section of the fourth floor of Rufus Smith Hall. Prior to Buettner-Janusch's arrival, the front two-thirds of that floor were occupied by offices. Professor Jolly's laboratory was located at the rear of the building. During the remodeling process, the offices were eliminated. But the masonry wall that separated them from Jolly's research facility was left intact, except that the door in the middle of the wall was taken off its hinges, leaving an open passageway. After the remodeling, access to Jolly's laboratory could be gained either by passing through Buettner-Janusch's new laboratory and through the open doorway, or by using a freight elevator situated at the rear of Jolly's laboratory.

At Buettner-Janusch's invitation, Jolly and the graduate students who assisted him made frequent use of some of the equipment in the new laboratory, including the deionized water, the aspirator, the gas line, and the measuring scales. They used the rest of the new facilities less regularly; for example, Jolly could not remember using the fume hood at all in 1979.

Access to the laboratory was not limited to Buettner-Janusch and Jolly. Richard Macris, an NYU undergraduate whom Buettner-Janusch had hired as a laboratory assistant in 1977, also had keys to the door of the new laboratory. The defendant attempted to portray Macris as a mere errand boy, but Judge Brieant found that Macris had "full use of all the chemicals [in Buettner-Janusch's laboratory], and he frequently performed experiments . . . at defendant's request." *United States v. Buettner-Janusch*, 500 F.Supp. 1285 at 1288 (S.D.N.Y. 1980).[2]

In early February 1979, Macris began to suspect that some of the chemicals Buettner-Janusch had asked him to synthesize were illegal drugs, or so-called controlled substances. He reported his suspicions to Jolly, who advised him to keep a diary of what he observed. Jolly, too, commenced an inquiry into Buettner-Janusch's work, taking samples of various chemicals, recovering scraps of paper from garbage pails, and photographing suspicious containers.

Alarmed by what they found, Macris and Jolly met with Macris's brother Robert, a practicing New York attorney, to tell him they believed Buettner-Janusch was manufacturing methaqualone. Fearful of making a false accusation against someone of Buettner-Janusch's prominence, they decided to secure more evidence before going to the authorities. Robert arranged, through intermediaries, to have the surreptitiously obtained samples tested on a confidential basis at the DEA laboratory in New York City. In mid-May, the Macris brothers and Jolly received word that the DEA had found the samples to contain a high concentration of methaqualone.

Several days later, in the early afternoon of May 16, they conveyed their startling findings to Dr. John Sawhill, then-President of NYU, and to Andrew Schaffer, NYU's general counsel. Later that day, Schaffer, Jolly, and Richard and Robert Macris met with Assistant United States Attorney Dominic Amorosa and DEA Agent Jack Toal in the U. S. Attorney's office for the Southern District of New York. There, Richard turned over the diary he had compiled on Buettner-Janusch's activities, and Jolly delivered samples of the compounds the defendant had synthesized and relinquished certain photographs he had taken in defendant's laboratory. Macris and Jolly also apprised the federal authorities of the results of the confidential tests the DEA had conducted. Confident that this evidence satisfied the requirement of probable cause, Amorosa proposed obtaining a warrant to search the laboratory. In response, Schaffer suggested that NYU could consent to a search, thereby obviating the need for a warrant. He added, however, that final authorization would have to come from President Sawhill. Hopeful that permission would soon be forthcoming, Amorosa asked Jolly and Richard Macris to assist the DEA agents in the search of defendant's research facility. They readily agreed.

---

**2.** During the evidentiary hearings, Macris testified that he had permission to "enter all areas within the laboratory to locate chemicals and for other purposes."

Schaffer relayed Sawhill's consent the following day, and the quest to discover whether Buettner-Janusch had ventured into illegal drug-making was planned for approximately 10 o'clock that night. At the appointed hour, while Buettner-Janusch was attending a formal dinner, Richard and Robert Macris met Jolly, Toal, and five other DEA agents, including supervisory chemist Jeffrey Weber, outside Rufus Smith Hall. After assuring himself that no one was in the laboratory, Jolly admitted the search party, using his key to gain entry. He and Richard Macris pointed out suspicious containers to the agents, who, at Weber's instructions, seized several controlled substances. They found methaqualone in the fume hood and on a laboratory bench, marijuana in the new laboratory's "cold room," lysergic acid hydrazide on a laboratory bench, and a receptacle containing two vials of ergotamine tartrate, a precursor of LSD, which Jolly retrieved from the laboratory freezer.

Much of the testimony at the hearing centered on the circumstances under which Weber ordered the seizure of the methaqualone and the LSD precursors. Weber stated that he observed four translucent plastic containers lying in the fume hood almost as soon as he entered the laboratory. He did not inspect them immediately, however, for his attention was drawn to an open notebook lying on a laboratory bench. The notebook contained a series of entries which Weber interpreted as the melting points of methaqualone-containing compounds in various stages of purification. These entries corresponded to the markings on the receptacles in the fume hood. But this was not the only information Weber had to support his belief that these receptacles contained methaqualone. As a result of Jolly's prior investigation, Weber already knew that methaqualone had been detected in the laboratory, and during the search he discover-

ed several jars filled with methaqualone precursors. Upon examining the containers, he observed that they held a white, granular solid, resembling an impure form of the drug.[3] The chemist admitted, however, that even with all of this information he was not sure that the receptacles contained a controlled substance. But his strong suspicion ripened into certainty when he unscrewed the top of one of the containers and detected the powerful odor of toluene, a solvent regularly used in methaqualone synthesis.

In contrast, the translucent container Jolly retrieved from the freezer provided Weber with little information as to its contents. Although this receptacle was constructed of plastic with the same opacity as that used in the methaqualone containers, the contents of this receptacle—two vials which proved to hold ergotamine tartrate—were not discernible through the container walls. And because Weber had no prior information that LSD was being synthesized in the laboratory, he had no reason to believe that this receptacle contained LSD precursors.

Based on these factual findings, and relying primarily on *Arkansas v. Sanders*, 442 U.S. 753, 99 S.Ct. 2586, 61 L.Ed.2d 235 (1979), and *United States v. Dien*, 609 F.2d 1038 (2d Cir. 1979), *adhered to*, 615 F.2d 10 (2d Cir. 1980), Judge Brieant suppressed the receptacle retrieved from the freezer, but determined that the seizure of the containers of methaqualone did not offend the Fourth Amendment.[4] The judge also ruled that only Macris and Jolly had authority to consent to the search; the University did not.

At trial, the Government introduced the admissible fruits of the May 17 search, supplemented by the testimony of Schaffer, Richard Macris, Jolly, Toal, and Weber. Before the case went to the jury, Judge Brieant dismissed the obstruction of justice count. The jury convicted the defendant on

---

**3.** Judge Brieant described these containers as "sufficiently transparent to allow observation of the nature and appearance of the substances inside." *United States v. Buettner-Janusch*, 500 F.Supp. 1285 at 1289 (S.D.N.Y.1980).

**4.** The lower court also suppressed evidence seized during a warrantless search of a locked enclosure in the basement of Rufus Smith Hall on August 2, 1979. The legality of that search is not before us.

four of the five remaining counts, and acquitted him of distributing cylert pemoline. Judge Brieant sentenced Buettner-Janusch to a total of five years' imprisonment, to be followed by a two-year special parole term on the manufacturing count.

## II.

■ Having stated the factual background with some detail, we approach our discussion of the law. It is basic Fourth Amendment jurisprudence that when the Government seeks to intrude upon an individual's legitimate expectations of privacy, it must either obtain a warrant from a neutral magistrate or bring its search within one of the few "jealously and carefully drawn" exceptions to the warrant requirement, *Jones v. United States*, 357 U.S. 493, 499, 78 S.Ct. 1253, 1257, 2 L.Ed.2d 1514 (1958). Throughout this litigation, the prosecution has maintained that the May 17 search was validated by the consent of Jolly and Richard Macris.[5] To satisfy the burdens imposed on it by the third party consent principle, the Government must show, by a preponderance of the evidence, that the consent to search was freely and voluntarily given, *see Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973), and was obtained from someone "who possessed common authority over or other sufficient relationship to the premises or effects sought to be inspected." *United States v. Matlock*, 415 U.S. 164, 171, 94 S.Ct. 988, 993, 39 L.Ed.2d 242 (1974). Since third party consent does not involve the vicarious waiver of a defendant's constitutional rights, it validates a search only when a defendant can be said to have assumed the risk that someone having authority over the area to be searched would permit the governmental intrusion in his own right. *See id.* at 171 n.7, 94 S.Ct. at 993 n.7; *United States v. Block*, 590 F.2d 535, 539–40 & n.5 (4th Cir. 1978). Buettner-Janusch assails the constitutionality of the May 17 search both on the ground that consent was not given voluntarily and on the theory that Jolly and Macris lacked the requisite authority to grant permission to search.[6]

## A.

■ The question of the voluntariness of Macris's and Jolly's consent need not detain us long. Whether consent was given voluntarily is an issue of fact, to be determined by the trial judge, who is to draw his findings from all of the appropriate and relevant circumstances. *Schneckloth v. Bustamonte, supra*, 412 U.S. at 248–49, 93 S.Ct. at 2058–59. The court's findings will not be set aside on appeal unless they are clearly erroneous. *United States v. Sanchez*, 635 F.2d 47 (2d Cir. 1980); *United States v. Griffin*, 530 F.2d 739, 742 (7th Cir. 1976); *United States v. Bronstein*, 521 F.2d 459, 463 (2d Cir. 1975), *cert. denied*, 424 U.S. 918, 96 S.Ct. 1121, 47 L.Ed.2d 324 (1976). Moreover, it is well settled that consent may be inferred from an individual's words, gestures, or conduct. *United States v. Griffin, supra*, 530 F.2d at 742. Thus a search may be lawful even if the person giving consent does not recite the talismanic phrase: "You have my permission to search."

■ Judge Brieant's finding that both Macris and Jolly impliedly consented to the

---

5. Although the Government urges us to uphold the University's power to consent to the search, in light of our disposition of the other issues raised in this appeal, we need not reach that question.

6. As a preliminary matter, we must address Buettner-Janusch's contention that because the DEA agents who conducted the search relied only on the University's power to consent, the prosecution cannot now assert that Macris and Jolly could also authorize this intrusion. This argument must be rejected, since it "ignores the settled rule that in judging the legality of a search, courts must apply an objective standard and will not be bound by the subjective 'beliefs of the arresting officer [or] the Assistant United States Attorney at trial.' *United States v. Tramontana*, 460 F.2d 464, 466 (2d Cir. 1972)." *United States v. Jenkins*, 496 F.2d 57, 72–73 (2d Cir. 1974), *cert. denied*, 420 U.S. 925, 95 S.Ct. 1119, 43 L.Ed.2d 394 (1975). *See United States v. Ochs*, 595 F.2d 1247, 1256 (2d Cir.), *cert. denied*, 444 U.S. 955, 100 S.Ct. 435, 62 L.Ed.2d 328 (1979).

May 17 search is amply supported by the record. These two initiated the investigation of Buettner-Janusch's illegal activities; they reported their findings to the University and to the U.S. Attorney's Office, among others; and they readily agreed to assist the DEA agents during the raid. Moreover, the cooperative relationship that existed among Macris, Jolly, and the DEA agents on the night of the search provides strong evidence that these informants freely acquiesced in the investigation. *See United States v. Kurck*, 552 F.2d 1320 (8th Cir. 1977) (*per curiam*). In short, there is "no evidence . . . of coercion or other circumstances that would render consent invalid." *United States v. Candella*, 469 F.2d 173, 175 (2d Cir. 1972), citing *United States v. Rothberg*, 460 F.2d 223, 224 (2d Cir. 1972).

### B.

■ This brings us to the heart of defendant's constitutional objections—that neither Jolly nor Macris had the authority to consent to the warrantless search of May 17. We have had several opportunities since the Supreme Court decided *United States v. Matlock, supra,* to consider the scope of the third party consent principle. The well established rule in this Circuit is that "[c]onsent to a search by one with access to the area searched, and either common authority over it, a substantial interest in it or permission to exercise that access,

express or implied, alone validates the search." *United States v. Gradowski*, 502 F.2d 563, 564 (2d Cir. 1974) (*per curiam*). *See United States v. Pravato*, 505 F.2d 703, 704 (2d Cir. 1974) (*dictum*); *United States v. Jenkins*, 496 F.2d 57, 72 (2d Cir. 1974), *cert. denied*, 420 U.S. 925, 95 S.Ct. 1119, 43 L.Ed.2d 394 (1975).

■ Judge Brieant, applying this standard, found that both Macris and Jolly had access to Buettner-Janusch's laboratory, that Macris had common authority over it, and that both Macris and Jolly had express or implied permission to use the facility. We find ourselves in total agreement. The simple answers are that both Macris and Jolly had keys to the defendant's laboratory, thus satisfying the access requirement of *Gradowski*. Furthermore, to perform his laboratory duties, Macris was authorized to enter any part of the laboratory and to open any jars of chemicals found there. These facts clearly establish both "common authority" and "permission to exercise access."[7] Jolly also satisfied the second branch of the *Gradowski* test because he had standing permission to use the equipment in Buettner-Janusch's laboratory, and was required to pass through it to reach his own facility.

But the constitutional inquiry does not end at this point, as Buettner-Janusch correctly contends. He maintains that even if Macris and Jolly could allow the DEA

---

**7.** Macris, feigning mononucleosis, asked Buettner-Janusch for a leave of absence in early May. The defendant, who had been unable to pay Macris for any part of the work he performed in 1979, granted the request, but invited Macris to return as soon as he recovered. Buettner-Janusch now argues that these circumstances undercut the Government's assertion that Macris could consent to the search. But the questions of implied permission and common authority are not to be decided simply on the basis of an employment relationship. While such a relationship may be strong evidence of the third party's power to consent, *see United States v. Murphy*, 506 F.2d 529 (9th Cir. 1974) (*per curiam*), *cert. denied*, 420 U.S. 996, 95 S.Ct. 1433, 43 L.Ed.2d 676 (1975); *United States v. Sells*, 496 F.2d 912 (7th Cir. 1974) (*per curiam*), its absence is not determinative, *see United States v. Matlock*, 415 U.S. 164, 94 S.Ct.

988, 39 L.Ed.2d 242 (1974) (joint tenant could consent to a search of common area); *Frazier v. Cupp*, 394 U.S. 731, 740, 89 S.Ct. 1420, 1425, 22 L.Ed.2d 684 (1969) (joint user could consent to search of duffel bag); *United States v. Long*, 524 F.2d 660 (9th Cir. 1975) (wife could consent to search of house she formerly shared with husband); *United States v. Jenkins, supra* (joint tenant could consent to search of apartment); *United States v. Cataldo*, 433 F.2d 38 (2d Cir. 1970), *cert. denied*, 401 U.S. 977, 91 S.Ct. 1200, 28 L.Ed.2d 326 (1971) (same).

Moreover, Buettner-Janusch did not regard Macris's departure as permanent. He understood that Macris would resume working in the laboratory as soon as he "recovered" from his feigned illness. Indeed, Macris returned to the facility in June, 1979, several weeks after the search, and began to work for Jolly.

agents to enter the laboratory, they could not authorize an examination of its enclosed areas, such as the fume hood, cabinets, cold room, and freezer. This is so, the defendant argues, because he had an independent expectation of privacy in these areas.

To evaluate this claim, we must explore the relationship between the doctrine of third party consent and the concept of expectation of privacy. Without engaging in "metaphysical subtleties," *Frazier v. Cupp*, 394 U.S. 731, 740, 89 S.Ct. 1420, 1425, 22 L.Ed.2d 684 (1969), we recognize that not all the areas or containers in a room are equally private. As an illustration, a person has a greater expectation of privacy related to items hidden in his wall safe than in those scattered over his kitchen table. If a specific area is in fact surrounded by an independent privacy interest, a government agent must either obtain a warrant to search it or is required to bring his examination within one of the exceptions to the warrant requirement. Thus, the Government may scrutinize even the most private enclosure if the third party has the authority to permit the intrusion. Here too, the third party's power to consent is to be tested under the familiar *Gradowski* standard.

We agree with the district court that Buettner-Janusch forfeited any reasonable expectation of privacy by granting permission to use the enclosed area of his laboratory to Macris, Jolly, and at least eight other persons.[8] But assuming arguendo that Buettner-Janusch retained an independent privacy interest in these areas, both Macris and Jolly had access and at least implied permission to use them. Thus, this aspect of the May 17 search was also lawful. *See United States v. Gradowski, supra.*

Finally, Buettner-Janusch maintains that even if the Government could search the fume hood and the other enclosed areas, it could not examine the containers of methaqualone found in the hood or the receptacle containing the LSD precursors which Jolly retrieved from the freezer. Our response to this is that the analysis we have recited has disposed of this claim. If the defendant had an independent, reasonable expectation of privacy in these containers, the agents either had to secure a warrant or obtain valid third party consent. To determine whether the defendant had a legitimate privacy interest in a particular receptacle, we look to *Arkansas v. Sanders*, 442 U.S. 753, 99 S.Ct. 2586, 61 L.Ed.2d 235 (1979), which instructs that:

> Not all containers and packages found by police during the course of a search will deserve the full protection of the Fourth Amendment. Thus, some containers (for example, a kit of burglar tools or a gun case) by their very nature cannot support any reasonable expectation of privacy because their contents can be inferred from their outward appearance. Similarly, in some cases the contents of a package will be open to "plain view," thereby obviating the need for a warrant.

*Id.* at 764 n.13, 99 S.Ct. at 2593 n.13. *See United States v. Mannino*, 635 F.2d 110 at 114 (2d Cir. 1980) (requiring some "objective, external evidence of an expectation of privacy."); *United States v. Dien*, 609 F.2d 1038 (2d Cir. 1979), *adhered to*, 615 F.2d 10 (2d Cir. 1980) (holding that marijuana hidden within sealed cardboard boxes was not within "plain view," so that the boxes could not be opened without a warrant).

Judge Brieant correctly applied the *Sanders* rule to the various containers seized in Buettner-Janusch's laboratory.

---

**8.** The defendant argues that because he transported the fume hood from Duke University to NYU, he must have had a heightened expectation of privacy concerning it. But even if we were to regard this as evidence that Buettner-Janusch enjoyed some sort of property right to the hood, his reliance on the law of property is misplaced. Standing alone, such rights do not necessarily give rise to interests protected by the Fourth Amendment. *See Katz v. United*

States, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967); *Jones v. United States*, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960). And although the defendant may have derived a legitimate expectation of privacy by exercising his right to prevent others from using the hood, *see Rakas v. Illinois*, 439 U.S. 128, 143 n.12, 99 S.Ct. 421, 430, n.12, 58 L.Ed.2d 387 (1978), the fact remains that he did not exercise this right with respect to Macris or Jolly.

Agent Weber lawfully examined the containers discovered in the fume hood since he could properly infer they contained methaqualone from their outward appearance.[9] Indeed, when viewed in the context in which they were seized, the compounds were, for all practical purposes, in "plain view." *See United States v. Callabrass*, 607 F.2d 559, 564 (2d Cir. 1979), *cert. denied*, 446 U.S. 940, 100 S.Ct. 2163, 64 L.Ed.2d 794 (1980). In contrast, Buettner-Janusch retained a legitimate expectation of privacy in the container Jolly removed from the freezer, since this object divulged no clues as to its contents until Weber removed its top.[10] But applying *Gradowski* to that object, we note that Macris had Buettner-Janusch's clear permission to open any of the jars of chemicals in the laboratory. Presumably then, he could have examined the two vials of LSD precursors that Jolly re-moved from the freezer. Thus, it was lawful for DEA chemist Weber, who searched the laboratory and vials at Macris's invitation, to do the same.

### III.

We have carefully considered the remainder of Buettner-Janusch's contentions and find them to be without merit. This is one of those hard cases in which it is difficult to explain the motives for criminal acts ruinous of an otherwise distinguished career. We do not possess the omniscience to supply the answer. The judgment of conviction is affirmed.

**9.** At the moment Weber opened these items, he already knew that Jolly had obtained a sample of methaqualone from the laboratory. He had also discovered partially empty jars containing precursors to methaqualone, and had examined the melting point data in the laboratory notebook. Furthermore, he could perceive through the containers' translucent walls that they were filled with a whitish granular substance that resembled methaqualone in an impure state.

**10.** Judge Brieant concluded his analysis of the legality of Weber's search at this point, relying on *United States v. Dien, supra*, for the principle that once a government agent discovers a container in which a defendant retains a legitimate expectation of privacy, the agent may not examine it without a warrant. Although not strictly necessary to our holding, it may be useful if we explain the bearing of *Dien* on the issues before us. In *Dien*, we held unlawful an examination of three cardboard boxes partially secured with tape and found in defendants' van. We noted that the expectation of privacy surrounding a sealed package is not vitiated merely because it is found in an automobile, which itself is subject to a diminished expectation of privacy. *See Chambers v. Maroney*, 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970); *Carroll v. United States*, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925).

*Dien's* rationale was that the twin policies underlying the automobile exception—the inherent mobility of automobiles and the presumably lesser expectations of privacy that surround them—do not apply to luggage or similar containers discovered during an automobile search. *See Arkansas v. Sanders, supra*. In contrast, the third party consent exception rests on totally different considerations. As we have stated at some length, this principle is premised on the notion that the third party has authority to consent to the search in his own right. *See United States v. Matlock, supra*. Thus, it is incorrect to hold that because the automobile exception is inapposite in a particular case, the third party consent exception also has no application. In short, nothing in *Dien* prevents a third party from permitting a search of a sealed container, provided his authority to consent satisfies the *Gradowski* requirements.

Finally, we reject the defendant's argument that *Walter v. United States*, 447 U.S. 649, 100 S.Ct. 2395, 65 L.Ed.2d 410 (1980), required the Government to secure a search warrant before analyzing either the samples of methaqualone it received from Jolly or the substances it seized during the May 17 search. In *Walter*, a divided Court held that although FBI agents had lawfully obtained an allegedly obscene film, they could not screen it without first obtaining a warrant. *Walter* is distinguishable from the instant case in two respects. Unlike the defendant in *Walter*, Buettner-Janusch had no independent expectation of privacy in the chemicals seized from his laboratory. These substances were either lying open on laboratory benches or were in containers that exposed their contents to the casual observer. Moreover, the governmental intrusion in *Walter* was not authorized by the consent of a third party who satisfied the *Gradowski* requirements. Here, however, the DEA obtained the samples from individuals who had access to them and permission to exercise that access. Accordingly, *Walter* does not require us to suppress this evidence.