**UNITED STATES of America**

v.

**Sheldon BUSCHEL, a/k/a Robert G. Solomon and Mark T. Hein.**

**No. 84–CR–26.**

United States District Court, N.D. New York.

Aug. 13, 1984.

---

See also 594 F.Supp. 942.

Frederick J. Scullin, Jr., U.S. Atty., Albany, N.Y., for the U.S.; John J. McCann, Asst. U.S. Atty., Syracuse, N.Y., Robyn C. Mitchell, Trial Attorney, U.S. Dept. of Justice, Washington, D.C., of counsel.

Arkin & Arisohn, P.C., New York City, for defendant Buschel; Marc Bogatin, New York City, of counsel.

Zwerling & Mark, P.C., Alexandria, Va., for defendant Hein; John Flowers Mark, Alexandria, Va., of counsel.

## MEMORANDUM–DECISION and ORDER

MINER, District Judge.

### I

Defendant Sheldon Buschel, also known as Robert G. Solomon, was charged in a two-count indictment with unlawful possession with intent to distribute approximately 1,250 pounds of marijuana, in violation of 21 U.S.C. § 841(a)(1) (Count I) and conspiracy to possess with intent to distribute the same controlled substance, in violation of 21 U.S.C. § 846 (Count II). Before the Court is Buschel's motion to suppress the marijuana described in the Indictment as well as other items seized by members of the New York State Police from the rented home he occupied at Napanoch, New York. Fed.R.Crim.P. 41(f). A hearing on the motion was conducted on May 30 and 31, 1984,[1] and final submissions of counsel

---

1. The hearing was combined with a hearing held in connection with the challenge of co-defendant Mark T. Hein to the legality of his arrest. A separate Memorandum-Decision and Order relative to the Hein motion will be issued at a later date. The witnesses at the joint hearing whose testimony was germane to the motion at bar were as follows: Leonard Durell, landlord of the property occupied by movant; George R. Rider, gas delivery man employed by Suburban Propane Gas Co.; John M. Lang, investigator, New York State Police; and Allen

were received in chambers on June 20, 1984.

## II

In late December, 1983, Buschel rented from Leonard Durell a colonial dwelling house located off Bennett Road in the Village of Napanoch, Town of Wawarsing, Ulster County. The house is surrounded by approximately one hundred acres of mostly wooded land, and access to it is gained through a driveway approximately one-half mile in length. The oral lease was for a three-month term covering the period January—March 1984. Buschel paid to Mr. Durell the sum of $3,750.00, representing three months' rent at $750.00 a month and a security deposit of $1,500.00 to cover heat, utilities and plowing, and took possession of the property on January 3, 1984. Buschel, who occupied the property under the name of Robert G. Solomon, made it clear that the house was not to be shown to anyone during his occupancy and Durell agreed to take the property off the market. The property had been listed for sale for approximately two years prior to that time by several real estate brokers in the area, and the lease was effected through the efforts of a broker known as "Metes and Bounds Realty." Allen Chamberlain, owner of "Chamberlain Realty," one of the brokers employed by Mr. Durell to effect a sale, was unaware of the lease and remained in possession of a set of keys to the house. On January 15, 1984, Chamberlain used the keys to enter the house through the basement doors for the purpose of showing the property to a prospective buyer. He was surprised to encounter Buschel at the premises, and apologized for the intrusion. Although Buschel allowed Chamberlain and the prospective purchaser to tour the house, with the exception of an upstairs bedroom, he accompanied them on their tour of the basement, where he discouraged them from examining a small workroom, saying that it contained garbage.

Immediately after the broker's unexpected visit, Buschel complained to Durell, who expressed his regrets for the violation of privacy. Buschel conveyed his displeasure to Durell in no uncertain terms, and Durell offered to refund the rental payments. The refund was refused, but Buschel demanded that his permission be obtained in advance for any future visits. Durell asserted that he would do his best to see that such notice was given. Shortly thereafter, the prospective purchaser appeared again at the property for a further inspection, accompanied by Chamberlain and Durell. Buschel also was present, apparently having given previous permission for the entry. On that occasion, he instructed those present not to enter the workroom, because valuable items were kept there. Moreover, the door to the workroom was blocked by a stack of firewood three to three and one-half feet high.

At a later time, Durell entered the unlocked house after representatives of the Suburban Propane Gas Company had delivered fuel to the premises at Buschel's request. Buschel had notified Durell that the fuel tank was empty, and Durell went to the house to see that the furnace pilot light was on after the fuel delivery. Both Durell and the Suburban Propane employee gained access through an unlocked garage door. While he was in the house, Durell noticed some rolls of plastic and a heat sealing device. On yet another occasion, Buschel permitted a building inspector to enter the house at the request of Durell and Chamberlain. Although Durell was allowed to enter the property at various times, Buschel always made it clear to him that no one was to enter the workroom, because it contained "valuables" and Durell acknowledged his understanding of that proscription.

In order to advance the sale of the property to the purchaser procured by Chamberlain, it became necessary for bank appraisers to inspect the house, apparently for mortgage loan purposes. The inspection was scheduled for February 15, 1984,

Chamberlain, real estate broker. Various exhibits were received in evidence at the hearing.

and Chamberlain and Durell made several futile attempts to contact Buschel to secure his permission for the entry prior to that date. On the morning of February 15th, Durell told Chamberlain to enter the house with the appraisers without obtaining Buschel's consent and expressed to Chamberlain the hope "that Solomon's drugs were not all over the place." Chamberlain, also suspecting the presence of narcotics at the house and fearing for his safety, contacted Investigator Snyder of the New York State Police and requested an escort for the appraisers and himself. He advised Snyder of his suspicions about narcotics at the premises and his fear of the defendant. Investigator Snyder passed the information to Senior Investigator Keiler, who directed Investigator Lang to call Chamberlain. Lang agreed to accompany Chamberlain to the property, but Durell never was advised of Chamberlain's contacts with the state police. Chamberlain also informed the state police about his suspicions concerning the basement workroom and complained that Durell seemed more concerned about Buschel's rights of privacy than with making a $95,000.00 sale.

Chamberlain and Lang drove to the property late in the morning on February 15th and met the appraisers there. Chamberlain opened the garage door with a key and all proceeded through the garage into the house. The appraisers departed following their inspection of the premises, but their examination did not include an inspection of the basement workshop. After they left, however, Chamberlain led Investigator Lang to the workshop and assisted him in removing the wood that blocked the room's entrance door. Since the doorknob attachment was missing, it was necessary for Chamberlain to insert his pen in the mechanism to open the door. Lang then entered the workroom, turned on a light and was met with a strong odor of marijuana. To the right as he entered the room was a large sheet of black opaque plastic extending from the floor to the ceiling. On a shelf behind the sheet he found a large bale or bundle covered by the same type of black plastic. He pulled back the covering and found underneath it a wrapping of clear plastic, through which he observed marijuana. Lang immediately replaced the plastic, left the room, replaced the firewood and went upstairs to notify Senior Investigator Keiler by telephone of his discovery. He then returned to the state police barracks, where he prepared an application[2] for a warrant[3] to search the house. Two other state police officers were dispatched to secure the premises in the event of the return of Buschel to his home before the issuance and execution of the warrant. The search warrant was issued by the Wawarsing Town Justice on February 15, 1984, and fifty-eight bales of marijuana,[4]

2. The application for the search warrant included the following information furnished by Investigator Lang:

That on February 15, 1984 at approximately 1:15 PM I personally observed the property mentioned in section * *B of this application. That based on my experience I have reason to believe that the property observed is unlawfully possessed pursuant to the aforementioned [sic] Atricles [sic] of law; and further that I have reason to believe based on my experience that written and/or recorded records may be found concerning the possession, sale, acquisition, and/or inventory of said property. More specifically the property sought to be seized are bails [sic] of marijuana observed in the basement area of the location described in section * *C of this application. These observations were made while your deponent was in the company of ALLEN CHAMBERLAIN, who had requested your deponent accompany him to said location.

3. The warrant authorized the seizure of the following items: "The controlled substance marijuana, unlawfully possessed pursuant to Articles 220 and 221 of the Penal Law and Article 33 of the Public Health Law; and any written or recorded records evidencing the possession or sale of the aforementioned controlled substance."

4. The following items were included in the inventory of property seized pursuant to the warrant:
   1. 1 glass bottle with 15 green pills
   2. 1 plastic bag with 9 green pills
   3. 1 plastic bag with 6 large white capsules
   4. 1 plastic bag with 13 small white capsules
   5. 2 plastic bags with 13 yellow capsules
   6. 1 brown vial
   7. 1 glasine [sic] bag
   8. 1 single edge razor blade
   9. 1 clear glass sniffer

the controlled substance subject of this Indictment, were seized from the house pursuant to the terms of the warrant on the same day. Based upon that seizure, another search warrant [5] was obtained on February 20, 1984, and various records and packaging materials [6] were seized from the house as the result of the execution of that warrant.

### III

▪ The Government contends that "Chamberlain possessed a sufficient relationship and access to the Durell house to authorize his [Chamberlain's] consent to Investigator Lang's entry and inspection of the house, more specifically, the workshop where the marihuana was housed." Government's Post-Hearing Brief in Opposition to Defendant Buschel's Motion to Suppress at 8. Defendant Buschel, on the other hand, contends that the original warrantless search by Investigator Lang was unlawful, inasmuch as any consent to search given by Chamberlain was insufficient to justify Lang's entry. Where the Government relies upon any consent to search by a third party, it must demonstrate that the consent was freely and voluntarily given. *Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). In the case of a claimed third party consent to search premises "[t]he well established rule in this Circuit is that '[c]onsent to a search by one with access to the area searched, and either common authority over it, a substantial interest in it or permission to exercise that access, express or implied, alone validates the search.'" *United States v. Buettner-Janusch*, 646 F.2d 759, 765 (2d Cir.) (quoting *United States v. Gradowski*, 502 F.2d

563, 564 (2d Cir.1974) (per curiam)), *cert. denied*, 454 U.S. 830, 102 S.Ct. 126, 70 L.Ed.2d 107 (1981).

▪ In this case there is no question that Chamberlain freely and voluntarily gave his consent to Lang to search Buschel's house for narcotics and that he had access to the house by virtue of the keys given to him by Durell. It cannot be contended seriously, however, that Chamberlain had either common authority over the premises or any substantial interest in the property. He merely was a real estate broker engaged by Durell to sell the property, and he never received from Buschel, who was a tenant with the exclusive right to possession, express or implied permission to exercise any access. Although Buschel permitted him to remain at the property when he appeared there on several occasions, Chamberlain never was given permission to enter alone. The fact that Buschel had, on occasion, given others specific permission to enter the house in his absence did not serve to confer authority upon Chamberlain to exercise a right of access at any time of his own choosing. While he had Durell's permission to go upon the property on February 15, 1984, Chamberlain was fully aware that Buschel had not consented to his entry. His only authority on that day came from Durell, who was himself obligated to seek permission from Buschel before making any visit to the premises. Accordingly, Chamberlain had no right to consent on behalf of Buschel to a search by Investigator Lang.

The Government's argument that the landlord-tenant relationship between Durell and Buschel somehow changed after a buy-

---

10. 2 blue plastic sniffers
11. 1 roll of gray cloth tape
12. 1 box bounce fabric sofner [sic] sheets
13. 58 bales of marihuana

5. The second warrant authorized the seizure of the following items: "Records of Marihuana shipments, sales, locations of other stash houses, records of customers, papaphernalia [sic] used to wrap, ship and store marihuana scales and records to telephone calls from this residence."

6. The following items were listed in the inventory as seized pursuant to the second warrant:
   1—Roll gray duck Tape
   1—Bx [sic] gray garbage Bags
   9—Bags of samples of various records seized from (9) bags of garbage (1) in kitchen (8) from rear porch off kitchen outside.
   7—empty bags which contained Nylon utility bags
   1—empty box which contained Bounce

er for the property was found must be rejected. Buschel made it clear, after the buyer arrived on the scene, that his permission would be required for any visit inside the house. Although Durell said that he would try his best in that regard, Buschel agreed to no qualification of his rights as a tenant. The visits of Durell, Chamberlain, the gasman and the building inspector after the unexpected arrival of the prospective purchaser with Chamberlain, all were made with Buschel's express consent. Moreover, Buschel at all times demonstrated "objective, external evidence of an expectation of privacy," *United States v. Mannino*, 635 F.2d 110, 114 (2d Cir.1980), in the workroom. By his words and actions, he sealed off the basement room where his cache of marijuana was stored. No greater expectation of privacy could have been shown, and even if Lang were authorized to enter the house, it is clear that the workroom was "off limits." Under those circumstances, the search of the workroom without a warrant was improper. *United States v. Dien*, 609 F.2d 1038, 1046–47 (2d Cir.1979), *aff'd on rehearing*, 615 F.2d 10 (2d Cir.1980).

The Government's belated citation of *Nix v. Williams*, — U.S. —, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984) hardly bears mention. In that case it was held that "[i]f the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means ... then the deterrence rationale has so little basis that the evidence should be received." *Id.* at —, 104 S.Ct. at 2509–10 (footnote omitted). There was nothing inevitable about Investigator Lang's discovery of the marijuana in the workroom, and there was no evidence that the noxious substance ever would have been discovered in the absence of Lang's unlawful entry. Also rejected is the Government's claim that Investigator Lang's original search was justified by exigent circumstances requiring him to enter the premises to protect Chamberlain. In *Mincey v. Arizona*, 437 U.S. 385, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978), cited by the Government, the Supreme Court rejected the "murder scene exception" created by the Arizona Supreme Court as violative of the fourth and fourteenth amendments, although the Court did recognize the necessity for warrantless entries and searches by police to aid a person in need of emergency assistance or to promptly investigate a murder scene to locate other victims or a killer. As in *Mincey*, however, "it simply cannot be contended that [Lang's] search was justified by any emergency threatening life or limb." *Id.* at 393, 98 S.Ct. at 2413. No threats of any kind had been made against Chamberlain, and it seems apparent that Investigator Lang accompanied him only for the purpose of searching for the controlled substance he ultimately found.

IV

In light of the foregoing the defendant's motion is granted in its entirety and all items seized pursuant to the search warrants obtained after the original unlawful search are suppressed. *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).

It is so Ordered.