OPINION
{¶ 1} Defendant, William Justus, appeals from his conviction and sentence for possession of heroin, R.C. 2925.11(A), which were entered on his negotiated plea of no contest after the trial court denied Defendant's Crim.R. 12(C)(3) motion to suppress evidence.
 {¶ 2} The evidence Defendant sought to suppress was seized following a weapons pat-down of his person by Montgomery County Deputy Sheriff Andrew McCoy. Deputy McCoy had been dispatched to an apartment building in Harrison Township where the search and seizure took place on a complaint that a man was selling drugs out of the rear door of the apartment building. Deputy McCoy testified that he had made several prior drug arrests at the complex of apartment buildings there, and that in his experience about one out of four persons he arrested has been armed with a weapon of some type. When he arrived at the apartment building Deputy McCoy found two men seated in a truck that was parked outside the rear door. He testified that, in his experience, buyers often wait for drug dealers in that way. He questioned the men, who said that they were waiting for a friend who had gone inside to collect money he was owed.
 {¶ 3} While Deputy McCoy was engaged with the two men Defendant Justus started to emerge from the rear door of the apartment building, but upon seeing the deputy he looked surprised and went back inside. Defendant re-emerged a few minutes later. When he did, one of the men in the truck pointed at him and said, "That's my buddy that we're waiting for." However, instead of joining them, Defendant lowered his gaze and began walking away. His suspicions aroused, Deputy McCoy stopped Defendant to question him.
 {¶ 4} Defendant told Deputy McCoy that he was looking for someone Defendant had formerly worked with. Because that was different from what the two men in the truck had said, and based on his experience, his dispatch, and his knowledge concerning past drug activity at that location, Deputy McCoy decided to question Defendant further. Deputy McCoy asked Defendant to sit inside his police cruiser for that purpose. Deputy McCoy testified at the suppression hearing that he did that for safety reasons, because he was alone at the time with three suspects in a high crime area where many shootings had occurred.
 {¶ 5} Before putting Defendant inside his cruiser Deputy McCoy patted Defendant down for weapons, using the open palm of his hand. He felt a small, "tubular object" inside Defendant's left pants pocket. The object did not feel like a weapon, and Deputy McCoy did not immediately recognize what it was. When Deputy McCoy felt the object with his fingers he detected a tube with a cap on the end. Believing that it was a hypodermic needle, which is often used to inject heroin, Deputy McCoy reached into Defendant's pocket and removed the item, which turned out to be a used hypodermic needle with blood in the syringe. When Deputy McCoy asked Defendant where he got the needle Defendant said he had picked it up off the ground. Deputy McCoy then arrested Defendant for possessing drug paraphernalia. A subsequent search of Defendant's person incident to his arrest revealed a methadone tablet in Defendant's pocket.
 {¶ 6} Defendant was indicted on one count of possession of heroin and one count of possession of methadone, both fifth degree felonies in violation of R.C. 2925.11(A). Defendant filed a motion to suppress the evidence, which the trial court overruled following a hearing. Defendant subsequently entered a plea of no contest to the heroin charge in exchange for a dismissal of the methadone charge. The trial court found Defendant guilty and sentenced him to five years of community control. We granted Defendant leave to file a delayed appeal.
 ASSIGNMENT OF ERROR {¶ 7} "THE TRIAL COURT ERRED IN OVERRULING THE MOTION TO SUPPRESS AS THERE WAS NO PROBABLE CAUSE TO DETAIN AND SEARCH MR. JUSTUS."
 {¶ 8} Defendant presents three arguments in support of the error assigned: that his stop and detention by Deputy McCoy were not justified, that the weapons pat-down lacked the required suspicion that he was armed and dangerous, and that the search that allowed Deputy McCoy to identify and then seize the objects in his pocket as contraband exceeded the permissible scope and purpose of that search under the "plain feel" rule of Minnesotav. Dickerson (1993), 508 U.S. 366, 113 S.Ct. 2130,124 L.Ed.2d 334. Sustaining the error assigned on any of these grounds would have the same result; suppression of the evidence seized from Defendant's person. Therefore, we will address the argument which we believe is dispositive, which is that the pat-down search exceeded its permissible scope and purpose.
 {¶ 9} The Fourth Amendment to the Constitution of the United States prohibits unreasonable searches and seizures. Those conducted by law enforcement officers absent a prior judicial warrant of authority are per se unreasonable and therefore illegal. Katz v. United States (1967), 389 U.S. 347,88 S.Ct. 507, 19 L.Ed.2d 576.
 {¶ 10} In Terry v. Ohio (1967), 392 U.S. 1, 20 L.Ed.2d 889,88 S.Ct. 1868, the Supreme Court affirmed the investigative detentions performed by law enforcement officers are seizures for purposes of the Fourth Amendment. Nevertheless, per Terry, they are permitted without a warrant only when the officer acts on a reasonable and articulable suspicion of criminal activity. Id.
In that circumstance the officer is permitted to also conduct a pat-down search of the person detained, but only for weapons, not contraband, in order to neutralize the risk of physical harm where the officer is justified in believing that the individual whose suspicious behavior he is investigating is armed and presently dangerous to the officer or to others. Id. Any resulting seizure of weapons or contraband must satisfy the higher probable cause standard.
 {¶ 11} Concerned with departures from the traditional probable cause requirement that its "reasonable suspicion" standard permits, Terry emphasized that "[a] search for weapons in the absence of probable cause to arrest, however, must like any other search, be strictly circumscribed by the exigencies which justify its initiation." Id., at 25. Therefore, at most, only "a limited search of the outer clothing for weapons" is permitted. Id.
 {¶ 12} In Terry, the officer who reasonably suspected that Terry had a weapon found a knife inside his coat pocket. That was in 1963. Since then, with the great increase in illicit drug activity, many pat-down searches have yielded not weapons but drugs or drug paraphernalia of various kinds. Concern with potential abuses in that trend prompted the Supreme Court inMinnesota v. Dickerson to prescribe limits on methods used in weapons pat-downs that yield contraband. Building on the "plain view" exception to the warrant requirement, Dickerson held that an officer who is engaged in a weapons pat-down lacks the probable cause required to seize nonthreatening contraband detected through his sense of touch when its criminal character is not immediately apparent to him upon touching it.
 {¶ 13} The frisking officer in Dickerson felt a small lump in the suspect's front pocket and then, upon further tactile examination, concluded that the object was a lump of crack cocaine in a plastic or cellophane bag, which the officer removed from the suspect's pocket. The Supreme Court held that the seizure of drugs was unlawful because the officer exceeded the bounds of Terry by squeezing, sliding, and manipulating the object. The officer's authority was limited to running his hands over the outer clothing of the suspect to determine if he had a weapon. Once he concluded that there was no weapon, the officer had no further authority to run his hands over the suspect's body. While the lump may have made the officer suspicious, he could not continue to feel the object to confirm those suspicions.
 {¶ 14} At the hearing on Defendant's motion to suppress evidence, Deputy McCoy gave the following testimony concerning the "tubular object" he detected in Defendant's pants pocket during a pat-down search:
 {¶ 15} "Q. Okay. And describe how you were patting him down.
 {¶ 16} "A. Just on the outside of his clothes with an open palm.
 {¶ 17} "Q. Okay. And what are you looking for?
 {¶ 18} "A. Guns, knives, any type of weapons.
 {¶ 19} "Q. Okay. And when you were patting him down in this manner with the open palm and just patting up against him, what — that's when you found the tubular object?
 {¶ 20} "A. Yes.
 {¶ 21} "Q. Did — did you recognize what it was when you patted it immediately?
 {¶ 22} "A. Not immediately. When I felt it I kind of, you know, felt on it with my fingers. I could feel the tube and then the end felt like it had a cap on it. It's consistent with how a hypodermic needle feels.
 {¶ 23} "Q. And when you initially patted it down and felt the tubular object, did you — were you able to determine before you go further and scrunch it with you fingers, were you — did you know what it was?
 {¶ 24} "A. I didn't know for sure what it was. I thought it might be a hypodermic needle.
 {¶ 25} "Q. What happens then?
 {¶ 26} "A. When I — when I feel — when I feel it after I thought it was a hypodermic needle, I reached in his pocket and took the object out.
 {¶ 27} "Q. And what was it?
 {¶ 28} "A. It was a used hypodermic needle." (T. 17-18)
 {¶ 29} On cross-examination Deputy McCoy testified:
 {¶ 30} "Q. Now, you just — you said that you did a patdown and the patdown and — how do you — can you — how do you hold your hand when you're doing a patdown?
 {¶ 31} "A. I usually have the person who I'm patting down put their hands on the, like the back of my cruiser on my trunk area.
 {¶ 32} "Q. Yeah.
 {¶ 33} "A. And I hold on to the back of them with one hand while I'm patting down.
 {¶ 34} "Q. Open-handed like that?
 {¶ 35} "A. Yes. When I'm patting down the outside.
 {¶ 36} "MR. GORALESKI: And — Judge, may I approach the witness?
 {¶ 37} "THE COURT: You may.
 CROSS EXAMINATION CONTINUED {¶ 38} "BY MR. GORALSKI:
 {¶ 39} "Q. Deputy, of course this is an ink pen. Is this about the length of the object that you said you recovered?
 {¶ 40} "A. Maybe a little bit shorter than that, a little bit bigger around.
 {¶ 41} "Q. A little bit bigger around?
 {¶ 42} "A. A little bit, not much.
 {¶ 43} "Q. Okay. And this has edges on it, but this is something that you (indicated by patting) with just the pump.
 {¶ 44} "A. I — I feel it at first with the palm and then I —
 {¶ 45} "Q. And then you —
 {¶ 46} "A. — feel it with my fingertips from the outside.
 {¶ 47} "Q. But it didn't feel like a weapon.
 {¶ 48} "A. No, it did not feel like a weapon.
 {¶ 49} "Q. Okay. It could have been a pen.
 {¶ 50} "A. Could have been." (T. 33-34).
 {¶ 51} In Dickerson, the Supreme Court stated that the frisking
 {¶ 52} "officer in this case overstepped the bounds of the `strictly circumscribed' search for weapons allowed underTerry. See Terry, 392 U.S., at 26, 88 S.Ct., at 1882. Where, as here, `an officer who is executing a valid search for one item seizes a different item,' this Court rightly `has been sensitive to the danger . . . that officers will enlarge a specific authorization, furnished by a warrant or an exigency, into the equivalent of a general warrant to rummage and seize at will.' Texas v. Brown, 460 U.S., at 748, 103 S.Ct., at 1546-1547
(STEVENS, J., concurring in judgment). Here, the officer's continued exploration of respondent's pocket after having concluded that it contained no weapon was unrelated to `[t]he sole justification of the search [under Terry:] . . . the protection of the police officer and others nearby.'392 U.S., at 29, 88 S.Ct., at 1884. It therefore amounted to the sort of evidentiary search that Terry expressly refused to authorize, see id., at 26, 88 S.Ct., at 1882, and that we have condemned in subsequent cases. See Michigan v. Long, 463 U.S., at 1049, n. 14, 103 S.Ct., at 3480-3481; Sibron, 392 U.S., at 65-66,88 S.Ct., at 1904." Id., at 378.
 {¶ 53} On the record before us, we reach the same conclusion. Deputy McCoy testified that the tubular object he detected with the open palm of his hand didn't feel like a weapon, and that when he felt it he did not immediately recognize what it was. He said that when he then felt the object using his fingers "I could feel the tube and then the end of it felt like it had a cap on it. It's consistent with how a hypodermic needle feels." (T. 12-13). He deduced that it "might be a hypodermic needle," (T. 13), and that deduction proved correct. However, while it was the product of a less extensive exploration than the evidentiary search in Dickerson, his deduction was the product of the kind of evidentiary search conducted outside the bounds for weapons searches authorized by Terry and condemned in Dickerson. As it was the State's burden to prove the exception to the warrant requirement, any closeness the issue presents must be resolved against the State. Therefore, the trial court erred when it overruled Defendant's motion to suppress evidence.
 {¶ 54} The State argues, alternatively, that because a hypodermic needle may be used as a weapon, Deputy McCoy had probable cause to seize it as such. We are not persuaded. He testified that it didn't feel like a weapon, and it's clear from his explanation that his purpose after he felt it was to determine what it otherwise might be. We have held that reasonable suspicion of criminal activity may be hypothecated on facts other than those on which an officer actually relies to perform a Terry stop. State v. Gonsior (1996),117 Ohio App.3d 481. However, when the officer specifically rejects the alternative hypothesis on a matter of subjective judgment, as Deputy McCoy did, the principle does not apply.
 {¶ 55} The assignment of error is sustained. The judgment of the trial court will be reversed and the matter will be remanded for further proceedings consistent with this opinion.
Fain, J. and Donovan, J., concur.