OPINION
{¶ 1} Appellant, Daniel D. Helton ("Helton"), appeals his conviction for aggravated possession of drugs on the grounds that the arresting officer did not have reasonable suspicion to make a traffic stop in which he was arrested and that an oral statement made to the officer should have been suppressed. On review, we affirm the judgment entry of the trial court.
 {¶ 2} Helton was indicted for one count of aggravated possession of drugs, to wit, methamphetamine, on September 3, 2004. Aggravated possession of drugs is a violation of R.C.2925.11, and, based on the amount allegedly possessed in this matter, a felony of the fifth degree. Helton entered a plea of not guilty.
 {¶ 3} The amended bill of particulars reads, in relevant part:
 {¶ 4} "[On June 4, 2004,] [w]hile on Patrol at Eureka Road and Route 20, Deputy Martin observed a passenger who he thought he recognized as a Defendant wanted on warrants. As the vehicle approached State Road, it crossed the center line by half of the roadway. The vehicle turned north onto State Road and pulled into the Edgewood Plaza. Deputy Martin initiated a traffic stop.
 {¶ 5} "Upon making the stop, Deputy Martin observed the front passenger exit the vehicle. As Deputy Martin approached he noticed a male passenger in the back seat quickly shoving items in his pockets. Deputy Martin asked the male to exit the vehicle, the Defendant herein. Defendant stated that he did not have any identification with him. A terry[1] [sic] frisk of Defendant was performed. A plastic bag containing marijuana and a small bag containing methamphetamine was found in his right, front pants pocket. Defendant's identification was also found. Defendant was placed under arrest for possession of drugs and transported to the Ashtabula County Jail. As per policy, a routine inventory search of the back seat of Deputy Martin's cruiser was conducted. This inventory revealed a small metal tube. Defendant indicated it must have fallen out of his pocket."
 {¶ 6} Helton filed a motion to suppress physical evidence seized at the time of arrest and a motion to suppress the oral statement made by him at that time.
 {¶ 7} The trial court conducted a hearing on Helton's motions to suppress. The motions were overruled. Helton thereupon entered a plea of no contest to aggravated possession of drugs. The trial court found him guilty of the charge.
 {¶ 8} On May 13, 2005, Helton was sentenced to thirty days in jail, two years of community control sanctions, drug treatment, and suspension of his driver's license for six months. Helton filed a timely appeal to this court.
 {¶ 9} In this court, Helton asserts two assignments of error, the first of which is:
 {¶ 10} "Appellant's Fourth Amendment rights against search and seizure were violated when Deputy Martin of the Ashtabula County Sheriff's Department extended a traffic stop of a stretch limousine, that appellant was a rear passenger in. The search went beyond its original purpose, so as to conduct a pat down search of him without specific and articulable facts that he had a weapon or that he posed a threat to the officer's safety."
 {¶ 11} In this assignment of error, Helton claims that the trial court should have granted his motion to suppress physical evidence seized at the time of Helton's arrest. We disagree.
 {¶ 12} "Appellate review of a motion to suppress presents a mixed question of law and fact."[2] The appellate court must accept the trial court's factual findings, provided they are supported by competent, credible evidence.[3] Thereafter, the appellate court must independently determine whether those factual findings meet the requisite legal standard.[4]
 {¶ 13} Though Helton was merely a passenger in the vehicle that was stopped by Deputy Martin, he has standing to challenge the traffic stop. In State v. Carter, the Supreme Court of Ohio held that "[b]oth passengers and the driver have standing regarding the legality of a stopping because when the vehicle is stopped, they are equally seized, and their freedom of movement is equally affected."[5]
 {¶ 14} Helton argues that his arrest went beyond the purpose and scope of the initial traffic stop. Specifically, he argues that Deputy Martin observed the stretch limousine in which Helton was a passenger cross the center line while negotiating a right-hand turn. Deputy Martin thought he recognized a dangerous fugitive in the front passenger seat. He initiated a traffic stop based upon the marked lanes violation and to ascertain the identity of the front passenger. He gave the driver a warning concerning the marked lanes violation and ascertained that the front passenger was not the fugitive he had in mind. At that point, Helton's argument continues, having given the driver a warning, Deputy Martin went beyond the purpose and scope of the traffic stop when he ordered Helton out of the vehicle, conducted a Terry frisk for weapons, and discovered the plastic baggies containing marijuana and methamphetamine.
 {¶ 15} Our analysis begins with the United States Supreme Court in the case of Whren v. United States:
 {¶ 16} "Temporary detention of individuals during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a `seizure' of `persons' within the meaning of [the Fourth Amendment]. * * * An automobile stop is thus subject to the constitutional imperative that it not be `unreasonable' under the circumstances. As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred."[6]
 {¶ 17} That court went on to explain that:
 {¶ 18} "[I]n principle every Fourth Amendment case, since it turns upon a `reasonableness' determination, involves a balancing of all relevant factors. With rare exceptions not applicable here, however, the result of that balancing is not in doubt where the search or seizure is based upon probable cause."[7]
 {¶ 19} Within weeks of that decision by the United States Supreme Court, the Supreme Court of Ohio made a decision with respect to traffic stops in the case of Dayton v. Erickson, in which it adopted the holding of the Sixth Circuit Court of Appeals and approved the following language:
 {¶ 20} "`We hold that so long as the officer has probable cause to believe that a traffic violation has occurred or was occurring, the resulting stop is not unlawful and does not violate the Fourth Amendment. * * * The stop is reasonable if there was probable cause, and it is irrelevant what else the officer knew or suspected about the traffic violator at the time of the stop.'"[8]
 {¶ 21} The Supreme Court of Ohio went on to hold in theDayton v. Erickson case that:
 {¶ 22} "Where a police officer stops a vehicle based on probable cause that a traffic violation has occurred or was occurring, the stop is not unreasonable under theFourth Amendment to the United States Constitution even if the officer had some ulterior motive for making the stop, such as a suspicion that the violator was engaging in more nefarious criminal activity."[9]
 {¶ 23} Thus, from the above authorities, we can clearly state, as the court in Dayton v. Erickson stated, that the stop of a vehicle by a police officer where a "traffic violation has occurred or was occurring" is not unreasonable under theFourth Amendment.[10] In point of time, therefore, the subject violation has already occurred. We can also agree with the court in State v. Hodge that the legislature did not intend to give drivers the "option" whether to stay within a marked lane,[11] and that "[f]or the run-of-the-mill case, which this surely is, we think there is no realistic alternative to the traditional common-law rule that probable cause justifies a search and seizure."[12]
 {¶ 24} In the instant case, Helton does not dispute that Deputy Martin had probable cause to stop the driver of the stretch limousine for a marked lanes violation. Dayton v.Erickson stands for the proposition that it does not matter what the motive of the arresting officer was if he had probable cause for the stop.[13] Therefore, the reasonableness of the traffic stop is not in question.
 {¶ 25} The further investigation of Helton in the rear seat of the vehicle was based upon reasonable suspicion that criminal activity was in play by Helton.
 {¶ 26} "[I]f circumstances attending an otherwise proper stop should give rise to a reasonable suspicion of some other illegal activity, different from the suspected illegal activity that triggered the stop, then the vehicle and the driver may be detained for as long as that new articulable and reasonable suspicion continues * * *."[14]
 {¶ 27} As stated by the Second Appellate District:
 {¶ 28} "We merely hold today that where a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot and that the persons with whom he is dealing may be armed and presently dangerous, where in the course of investigating this behavior he identifies himself as a policeman and makes reasonable inquiries, and nothing in the initial stages of the encounter serves to dispel his reasonable fear for his own or other's safety, he is entitled for the protection of himself and others in the area to conduct a carefully limited search of the outer clothing of such persons in an attempt to discover weapons which might be used to assault him."[15]
 {¶ 29} After Deputy Martin ordered the passenger in the front seat out of the vehicle, he looked into the vehicle to see if there were other occupants and observed Helton making furtive gestures to stuff some object or objects into his pockets. Helton was asked for identification and advised Deputy Martin that he had no identification on his person. Helton was asked to exit the vehicle, at which time Deputy Martin conducted a pat-down search for weapons. At the suppression hearing, the deputy testified on direct examination as follows:
 {¶ 30} "I patted him down. When I did, I — I found his identification, which could identify him as Daniel Helton. I also felt in his right pant's pocket, I could hear a plastic bag and I could feel a substance that I thought to be marijuana by its texture and feel from the outside of his pants."
 {¶ 31} Deputy Martin later testified on cross-examination as follows:
 {¶ 32} "[Question:] Okay. Now, when you conducted your pat-down, you didn't feel — you didn't feel anything that felt to you, through your background and experience, like a weapon; am I right?
 {¶ 33} "[Answer:] No.
 {¶ 34} "[Question:] Okay. But you did feel a baggy, is that what you said?
 {¶ 35} "[Answer:] I could hear the crinkling of the bag when I went over his pocket."
 {¶ 36} One reading of the deputy's testimony is that he went directly into Helton's pockets and retrieved the baggies. Such a search is not permissible under Terry v. Ohio:
 {¶ 37} "[T]he `search for weapons approved in Terry
consists solely of a limited patting of the outer clothing of the suspect for concealed objects which might be used as instruments of assault.'"[16]
 {¶ 38} However, if in the process of conducting a limited pat-down search of the outer clothing for weapons, the officer detects through his sense of touch an object whose criminal character is "immediately apparent" to him, he is then justified in entering the pocket of the individual and seizing the object. This is known as the "plain feel" doctrine.[17] This doctrine was enunciated by the United States Supreme Court inMinnesota v. Dickerson:
 {¶ 39} "If a police officer lawfully pats down a suspect's outer clothing and feels an object whose contour or mass makes its identity immediately apparent, there has been no invasion of the suspect's privacy beyond that already authorized by the officer's search for weapons; if the object is contraband, its warrantless seizure would be justified by the same practical considerations that inhere in the plain-view context."[18]
 {¶ 40} We construe Deputy Martin's testimony to mean that he did indeed pat down the outer clothing of Helton for weapons and, in the process he determined through his sense of touch that Helton may have had contraband material on his person. Though he mentions that he "felt in his right pants pocket," the overall context of his testimony is to the effect that he felt the "outside of his pants" and that he "went over his pocket." A fair reading of his testimony is that Deputy Martin patted down Helton's outer clothing, that he heard and felt the baggies in his pocket, and that his training and experience told him that the substance he was feeling was marijuana. It was at that time that he reached into Helton's pocket and retrieved the two baggies.
 {¶ 41} Thus, Deputy Martin's testimony satisfies the "immediately apparent" prong of the test laid down in Minnesotav. Dickerson.
 {¶ 42} Also noteworthy from the deputy's testimony is that he first discovered during his pat-down search of Helton that Helton did indeed have identification on his person, contrary to his denial that he had identification just moments before. This lack of truthfulness reinforced the reasonable suspicion already possessed by Deputy Martin, and gave him more reason to continue the pat down of Helton's outer clothing, when he went on to discover the baggies in Helton's pants pocket.
 {¶ 43} The first plastic baggie did indeed contain marijuana. The deputy then retrieved a second plastic baggie from Helton's pants pocket, which contained a powdery white substance that later tested positive for methamphetamine.
 {¶ 44} Therefore, the circumstances giving rise to reasonable suspicion to further investigate Helton were the furtive gestures to stuff an object or objects into his pockets and his unwillingness to furnish identification. Deputy Martin had the right, for his own safety, to conduct a limited pat-down search for weapons.[19] He had the further right to seize the contraband in Helton's pocket when it became "immediately apparent" to him that it was contraband.[20]
 {¶ 45} For the foregoing reasons, we conclude that Helton's motion to suppress the physical evidence seized from him was properly overruled by the trial court.
 {¶ 46} Helton's first assignment of error is without merit.
 {¶ 47} Helton's second assignment of error is as follows:
 {¶ 48} "Appellant made an oral statement that should [be] suppressed."
 {¶ 49} After Helton was taken to the Ashtabula County Jail for processing, Deputy Martin went to his vehicle and found a metal tube in the back seat where Helton had been sitting as he was transported to the jail. Deputy Martin knew from his experience that such a tube was probably used to snort methamphetamine. Deputy Martin then approached Helton, held the tube up to him, at which time Helton told the deputy that the tube must have fallen out of his pocket.
 {¶ 50} Helton first argues in this assignment of error that the discovery of the metal tube stems from an illegal search and subsequent arrest, and that Helton's statement that was made after its discovery should be suppressed as the fruit of an illegal arrest.
 {¶ 51} However, as discussed in the first assignment of error, the traffic stop was based upon probable cause and was, therefore, legal; and the circumstances existing at the time of Deputy Martin's encounter with Helton gave him reasonable suspicion to pat him down for weapons. Having found the contraband on Helton's person, it was proper for the deputy to arrest him and transport him to the county jail. Though Helton was arrested without a warrant, his arrest passes constitutional muster where:
 {¶ 52} "[A]t the moment the arrest was made, the officers had probable cause to make it — whether at that moment the facts and circumstances within their knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that defendant had committed or was committing an offense."[21]
 {¶ 53} Helton was arrested after he was found to be in possession of methamphetamine. His arrest was valid.
 {¶ 54} Helton next argues that his statement regarding the metal tube was improperly elicited from him because it was given during a custodial interrogation for which Helton had not received Miranda warnings.[22] However, we agree with the ruling of the trial court that the statement was voluntarily given, and that Helton was not in a custodial interrogation at the time it was given. The deputy did not ask Helton about the tube, he merely held it up to him, at which time Helton stated that it must have fallen out of his pocket. There was no coercive conduct, which is necessary to invoke the Miranda
protections.[23] There was no custodial interrogation.[24]
 {¶ 55} Helton's statement is akin the statement given by the accused in State v. Perry, where the accused, after he was in custody, blurted out that "`he had never done anything like this before.'"[25] The Supreme Court of Ohio held in that case that "[t]he admissions were not the compelled product of custodial interrogation initiated by law enforcement officers, but were voluntary statements made while in custody," and were, therefore, admissible.[26] That court quoted from theMiranda decision that "`[a]ny statement given freely and voluntarily without any compelling influence is, of course, admissible in evidence.'"[27] We believe the rationale of the Perry case is applicable to Helton's case and that, though in custody, his statement was voluntarily given and was not given in the context of a custodial interrogation.
 {¶ 56} Helton's second assignment of error is without merit.
 {¶ 57} The judgment of the trial court is affirmed.
Ford, P.J., Grendell, J., concur.
[1] Terry v. Ohio (1968), 392 U.S. 1.
[2] State v. Burnside, 100 Ohio St.3d 152, 2003-Ohio-5372, at ¶ 8.
[3] State v. Guysinger (1993), 86 Ohio App.3d 592, 594.
[4] State v. Thompson (July 27, 2001), 11th Dist. No. 2000-T-0096, 2001 Ohio App. LEXIS 3356, at *5.
[5] (Citations omitted.) State v. Carter (1994),69 Ohio St.3d 57, 63.
[6] (Citations omitted.) Whren v. United States (1996),517 U.S. 806, 809-810.
[7] Id. at 817.
[8] Dayton v. Erickson (1996), 76 Ohio St.3d 3, at 9-10, quoting United States v. Ferguson (C.A.6, 1993), 8 F.3d 385,391-392.
[9] Dayton v. Erickson, supra, syllabus.
[10] Id.
[11] (Emphasis in original.) State v. Hodge,147 Ohio App.3d 550, 2002-Ohio-3053, at ¶ 43.
[12] Whren v. United States, 517 U.S. at 819.
[13] Dayton v. Erickson, supra, syllabus.
[14] State v. Myers (1990), 63 Ohio App.3d 765, 771. See, also, State v. Walker (Nov. 15, 1996), 11th Dist. No. 96-G-1966, 1996 Ohio App. LEXIS 4962, at *8.
[15] State v. Osborne (Dec. 13, 1995), 2d Dist. No. 15151, 1995 Ohio App. LEXIS 5452, at *10-11.
[16] State v. Ross, 2d Dist. No. 21170, 2006-Ohio-265, at ¶ 4, quoting Sibron v. New York (1968), 392 U.S. 40, 65.
[17] State v. Justus, 2d Dist. No. 20906, 2005-Ohio-6540, at ¶ 8.
[18] Minnesota v. Dickerson (1993), 508 U.S. 366, 375-376.
[19] Terry v. Ohio, supra, at 25-26. See, also, State v.King, 11th Dist. No. 2003-A-0018, 2004-Ohio-2598, at ¶ 11.
[20] Minnesota v. Dickerson, 508 U.S. at 375-376.
[21] (Citations omitted.) Beck v. Ohio (1964), 379 U.S. 89,91.
[22] Miranda v. Arizona (1966), 384 U.S. 436.
[23] State v. Ngiraingas, 11th Dist. No. 2004-A-0034,2005-Ohio-7058, at ¶ 41.
[24] See Id. at ¶ 43.
[25] State v. Perry (1968), 14 Ohio St.2d 256, 262.
[26] Id.
[27] Id. at 261, quoting Miranda v. Arizona, supra, at 478.