**[Cite as *State v. Ohlert*, 2013-Ohio-2579.]**

# IN THE COURT OF APPEALS OF OHIO
## SECOND APPELLATE DISTRICT
## MONTGOMERY COUNTY

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | Appellate Case No. 25389 |
| Plaintiff-Appellee | : | |
| | : | Trial Court Case No. 2012 CR 6161 |
| v. | : | |
| | : | |
| DAVID OHLERT | : | (Criminal Appeal from Dayton Municipal |
| | : |  Court) |
| | : | |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . . .

## O P I N I O N

Rendered on the 21st day of June, 2013.

. . . . . . . . . . .

JOHN J. DANISH, Atty. Reg. #0046639, and STEPHANIE L. COOK, Atty. Reg. #0067101, by ANDREW D. SEXTON, Atty. Reg. #0070892, Dayton City Attorney, 335 W. Third St., Rm. 372, Dayton, Ohio 45402
        Attorney for Plaintiff-Appellee

THADDEUS HOFFMEISTER, Atty. Reg. #0081977, University of Dayton Law Clinic, Dayton, Ohio 45469-2750
        Attorney for Defendant-Appellant

. . . . . . . . . . . . .

FAIN, P.J.

{¶ 1} Defendant-appellant David Ohlert appeals from his conviction and sentence for Possession of a Drug Abuse Instrument, in violation of R.C. 2925.12(A), a misdemeanor of the second degree, following a no-contest plea. Ohlert contends that the trial court erred by overruling his motion to suppress the evidence upon the ground that it was obtained as the result of an unlawful search and seizure.

{¶ 2} We conclude that the trial court did not err in overruling Ohlert's motion to suppress. There is evidence in the record that would support a conclusion that the initial contact between Ohlert and the police was a consensual encounter. Thereafter, Ohlert consented to a weapons pat-down. During the pat-down, as a result of Ohlert shifting his stance, the clearly recognizable needle-end of a syringe protruded from his jeans pocket, coming into plain view of the police officer, who seized it.

{¶ 3} The judgment of the trial court is Affirmed.

## I. The Encounter and Search

{¶ 4} One evening in late July 2012, Dayton Police Detective Michael A. Auricchio was returning home, in an unmarked car, after having served in a special detail covering Michelle Obama's visit to the Dayton area. Auricchio, a 23-year veteran of the Dayton Police Department, with fifteen years as a detective, was in uniform, but off duty.

{¶ 5} Auricchio noticed Ohlert and a woman, who were on foot. They matched the general descriptions of two suspects in a burglary that had been committed in the immediate vicinity three days earlier. Auricchio got out of his car, approached them, and asked if he could speak with them for a few minutes.

{¶ 6} Auricchio told the pair that they matched the descriptions of two suspects in a

recent burglary in the immediate area. After learning that they had no identification on them, Auricchio told them, truthfully, that his radio had stopped working, but that an officer was on his way, and would be there shortly to check out their identities. Ohlert and the woman were cooperative during the entire time.

{¶ 7} Three to four minutes later, Dayton Police Sergeant Mark Ponichtera arrived on the scene and "took over" the investigation. Auricchio remained at the scene, however. Ponichtera decided to do a pat-down.

{¶ 8} Ponichtera asked Ohlert: "I would like to pat you down. You don't mind, do you?" Ohlert responded, "no." During the pat-down, Ohlert shifted his stance, and the capped needle-end of a syringe protruded out of his jeans pocket, plainly visible. Ponichtera immediately recognized the object as a hypodermic syringe, and seized it.

## II. The Course of Proceedings

{¶ 9} Ohlert was charged with Possession of a Drug Abuse Instrument. He moved to suppress the evidence, contending that it was obtained as the result of an unlawful search and seizure.

{¶ 10} At the conclusion of the hearing, the trial court overruled the motion, reasoning as follows:

O.K. Based upon the evidence and the testimony presented today, I do believe it was a voluntary encounter. Even if it weren't a voluntary encounter, I would also believe it to be a reasonable stop based upon the information. It wasn't just the information that a burglary had occurred in the area. It was the

fact that there was a burglary and you had two people who were there together who strongly matched the description of those involved in that burglary. These weren't just minor details. They were somebody relatively tall who had the same description and the female who had the same description. So I believe it was first a voluntary encounter and then, even if that weren't the case, it was a reasonable stop.

With regards to the frisk. The officer asked or indicated that he would like to pat him down and asked the defendant do you mind? And the defendant said no and raised his hands. I do believe it was a consensual pat down. I don't believe that the interlocking of the fingers takes it away from being consensual. I believe that again, it just ensures the safety of the officer during the pat down. It was a quick pat down. The officer discovered the needle.

\* \* \*

I guess the last point would be to note what the State said. This whole encounter was six to eight minutes from the time Detective Auricchio first talked to him to the time the defendant was placed in cuffs was approximately six to eight minutes if you give it the three to four minute time line that each officer gave. (Paragraph breaks added.)

**{¶ 11}** Ohlert pled no contest. He was sentenced to 90 days in jail, with credit for 30 days served, and the 60-day balance suspended. He was given one year of supervised probation, and entered into a drug treatment program.

**{¶ 12}** From his conviction and sentence, Ohlert appeals, assigning two errors:

THE OFFICERS VIOLATED THE APPELLANT'S FOURTH AMENDMENT RIGHTS WHEN THEY STOPPED AND SEARCHED HIM WITHOUT REASONABLE SUSPICION.

MR. OHLERT MERELY ACQUIESCED TO A PAT DOWN SEARCH.

{¶ 13} In both of his assignments of error, Ohlert essentially contends that the trial court erred when it overruled his motion to suppress.

### III.   Ohlert's Contact with the Police Was a Consensual Encounter

{¶ 14}   We agree with the trial court that Ohlert's contact with Auricchio, and later with Ponichtera, was a consensual encounter.

{¶ 15}   Ohlert and his female companion were on foot.   Auricchio parked his car, without blocking them.   After getting out of his car, Auricchio approached them; he did not draw his weapon or "lay hands" upon either of them.   Auricchio asked if he could speak with them:

> A.   I asked if I could speak with them for a moment and they walked over towards me.   When they got to me I explained the reason why I stopped and wanted to talk to them.   I told them that there has been a burglary a couple of days earlier in the neighborhood and they matched the physical description of the two burglars.   I asked if they had any identification on them.   They both stated that they did not.   My radio was dead, I told them that there would be a crew here in just a moment and we could check their information on the radio.   I just began asking them some general questions.   Where do you live?   They both told me they were from Piqua and just made some small talk there with them until Sargent [sic] Ponichtera got there.

Q. Alright and when you asked them to come back over they were fifteen or twenty feet away from you, right?

A. Right.

Q. Did you command that they come over?

A. No.

Q. Did you order them to come over?

A. I don't recall ordering. I just said to the effect that I would like to speak with you for a couple minutes.

* * *

Q. How far away from you is Mr. Ohlert while you are having this small talk?

A. The three of us are standing basically at the back of my car. In fact, one of them even set a drink on my hood.

Q. OK. Did you tell Mr. Ohlert or the female, at any time, that they had to stay there?

A. I told them that I needed to speak with them. Explained why I wanted to talk to them and their response was "Well we didn't commit a burglary. We are not even from around here." And I just told them if they don't mind, if you can give me a couple of minutes we will clear this up and have you on your way.

Q. OK.

A. And they were agreeable to that.

Q. They were agreeable to that?

A. Yes.

Q. How long did it take in your estimation for Sargent [sic] Ponichtera to arrive once you got off the cell phone with the other officer?

A. Three or four minutes.

{¶ 16}   Auricchio testified that his purpose throughout the encounter was to establish the identity of the pair, "and then go from there."

{¶ 17}   When Ponichtera arrived in his marked cruiser, he parked it, without blocking Ohlert and his companion, got out, and "took over" the investigation.   Auricchio remained on the scene.   Like Auricchio, Ponichtera did not draw his weapon.   Ponichtera used a conversational tone.   Ponichtera testified that the pair were cooperative.   He testified that they were free to leave, although there is no indication that he told them that.

{¶ 18}   Ponichtera asked Ohlert if he had identification.   He did not.   Ponichtera then asked Ohlert for his name, and then conducted a pat-down search, leading to the discovery of the syringe and Ohlert's arrest.

{¶ 19}   A person is seized, for Fourth Amendment purposes, "only when, by means of physical force or a show of authority, his freedom of movement is restrained."   *U.S. v. Mendenhall*, 446 U.S. 544, 553, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980).   "Only when such restraint is imposed is there any foundation whatever for invoking constitutional safeguards." *Id*.

{¶ 20}   "[A] person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave."   *Id*. at 554.

{¶ 21} "Examples of circumstances that might indicate a seizure, even where the person did not attempt to leave, would be the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled. * * * . *In the absence of some such evidence, otherwise inoffensive contact between a member of the public and the police cannot, as a matter of law, amount to a seizure of that person.*" Id., at 554-555 (Emphasis added.)

{¶ 22} In the case before us, the encounter was commenced by Auricchio, a single police officer; Ponichtera did not arrive on the scene until three or four minutes after the encounter was underway. Although both officers had service firearms, the weapons remained holstered throughout the encounter. Neither officer touched Ohlert or his companion. Both testified that they used conversational tones of voice, saying nothing to give Ohlert the impression that he was not free to refuse the encounter.

{¶ 23} In *State v. Jones*, 112 Ohio App.3d 206, 678 N.E.2d 285 (2d Dist.1996), we found a consensual encounter where two police officers approached a passenger in an airport, identified themselves as police officers, asked to speak with the passenger, asked him for identification or, when the passenger indicated he was not carrying identification, for identifying information, and then asked for consent to search his carry-on luggage. We specifically rejected the passenger's "contention that an encounter is rendered nonconsensual merely because an officer does not inform an individual that he is free to leave." Id., at 213.

{¶ 24} The fact that Ohlert and his companion were told that they matched the descriptions of two suspects in a burglary, three days earlier, makes this a slightly closer case than *State v. Jones, supra,* on the issue of whether a reasonable person in Ohlert's position would

believe himself free to reject the encounter. Perhaps if either officer had indicated a belief that Ohlert was, in fact, one of the persons who had committed the burglary, the result would be different. But neither officer did so. Auricchio told Ohlert and his companion that once their identifications checked out, the encounter would be over. This suggests that the officers merely desired to establish the identities of Ohlert and his companion, so that they could be investigated later, if circumstances warranted.

{¶ 25} Another fact that makes this a slightly closer case is the fact that Auricchio did not go over to Ohlert and his companion, but asked to speak to them from fifteen to twenty feet away. In *U.S. v. Mendenhall, supra*, 446 U.S. at 555, the fact that the agents in that case "did not summon the respondent to their presence, but instead approached her and identified themselves as federal agents," was deemed significant. But Auricchio did get out of his cruiser. Furthermore, he testified that he told them "if you don't mind, if you can just give me a couple of minutes, we will clear this up and have you on your way," to which "they were agreeable." This testimony is inconsistent with the proposition that Auricchio effectively commanded Ohlert and his companion to speak with him.

{¶ 26} We conclude that the trial court was correct in finding this to have been a consensual encounter.

### IV. Ohlert Consented to the Pat-Down

{¶ 27} Ponichtera, on his arrival, "took over" the investigation from Auricchio. After ascertaining that Ohlert had no identification, in view of the nature of the area, Ponichtera decided to conduct a pat-down. Ponichtera asked Ohlert: "I would like to pat you down. You

don't mind, do you?" To this, Ohlert responded "no," and raised his hands up near his head.

{¶ 28} Ponichtera testified that he was speaking in a conversational tone of voice, did not draw his service weapon, and had not touched Ohlert up to this point. Ponichtera did ask Ohlert to interlace his fingers on his head, and Ohlert complied.

{¶ 29} Ohlert contends that under the totality of the circumstances, he did not voluntarily consent to the pat-down, but merely acquiesced in it.

{¶ 30} The issue is close. Nevertheless, we agree with the trial court's conclusion that Ohlert voluntarily consented to the pat-down. Ponichtera's question: "I would like to pat you down. You don't mind, do you?" was leading in the sense that it suggested the answer Ponichtera expected and wanted. But by putting in the form of a question, Ponichtera indicated that Ohlert could indicate that he did mind, and object to the pat-down search.

{¶ 31} Similarly, a search of a passenger on a bus was held to have been consensual in *U.S. v. Drayton*, 536 U.S. 194, 206, 122 S.Ct. 2105, 153 L.Ed.2d 242 (2002), where the police officer asked the defendant if he minded if the officer searched him, and "[n]othing [the officer] said indicated a command to consent to the search."

## V.   The Seized Syringe Was in the Officer's Plain View

{¶ 32} Ponichtera testified concerning his discovery and seizure of the hypodermic syringe as follows:

A.   I start to frisk him. And as I frisk him, I move down his upper body. And as I reach towards the back of his right pocket, just at the very same time as I reach the pocket he shifted his weight and he was wearing kind of loose fitting

jeans and a capped syringe at that point protruded from his pocket and, basically, my hand poked the top of the capped syringe at the very moment that it protruded from his pocket.

* * *

Q. And when you saw ... or I guess did you feel or see the syringe initially?

A. I felt it and saw it. It was all contemporaneous. As I moved my hand down his weight shifted and my hand poked the top of the syringe I knew immediately what it was.

Q. OK. This isn't something that you had reached into his pocket to gather?

A. No.

Q. Move out or manipulate?

A. No.

Q. OK. Based on your training and experience as a police officer, did you know what that was immediately?

A. Yes. There was no doubt in my mind I knew what it was and I could actually see the top of the capped syringe. It's a bright orange. They are commonplace. A lay person would be able to recognize it.

Q. And did you retrieve that item at that time?

A. I did.

* * *

Q. And what did you do with Mr. Ohlert after discovering the syringe?

A. Placed the handcuffs on him.

Q. And what was the reason for placing handcuffs on him at that time?

A. Well he wasn't free to leave at that point anymore. He had a syringe.
A syringe, in and of itself, isn't necessarily a violation of law if you are a diabetic or something of that nature, but it was not ... the way it was being transported and the way it was in his pocket in the manner of which I found it was not consistent with somebody who was a diabetic. A person of normal sense would say if you are a diabetic and deal with needles every day, if a police officer begins to pat you down, then you would say something. You would open your mouth and say I am a diabetic, I have a needle. And that did not occur in this case.

**{¶ 33}** Ohlert cites *State v. Justus*, 2d Dist. Montgomery No. 20906, 2005-Ohio-6540, for the proposition that once it was apparent to Ponichtera that the object in Ohlert's pocket was not a weapon, Ponichtera had no authority to seize it. In *Justus*, the police officer conducting the pat-down felt a tubular object with a cap on it, "consistent with how a hypodermic needle feels." *Id.* at ¶ 22. The officer testified that: "I didn't know for sure what it was. I thought it might be a hypodermic needle." *Id.* at ¶ 24. On cross-examination, the officer admitted that the object "could have been a pen." *Id.* at ¶ 50. We found that this was not enough to satisfy the plain-view, or plain-feel, exception to the warrant requirement.

**{¶ 34}** In the case before us, by contrast, Ponichtera admitted of no uncertainty in his recognition of the object in Ohlert's pocket as a hypodermic syringe, based on his visual observation of the capped needle.

While a police officer is conducting a lawful pat-down search for weapons, the officer may retrieve any contraband or incriminating evidence that he feels during the course of the pat-down, as long as the incriminating character of the contraband is immediately apparent to the officer through his sense of touch. *Minnesota v. Dickerson* (1993), 508 U.S. 366, 375-376, 113 S.Ct. 2130, 124 L.Ed.2d 334. In this context, an object's incriminating character is immediately apparent if the police officer has probable cause to associate the object with criminal activity. *State v. Halczyszak* (1986), 25 Ohio St.3d 301, 496 N.E.2d 925, paragraph three of syllabus. Probable cause to associate an object with criminal activity does not demand certainty in the minds of police, but instead merely requires that there be a "fair probability" that the object they see [or feel] is illegal contraband or evidence of a crime. *State v. Thompson* (1999), 134 Ohio App.3d 1, at 4, 729 N.E.2d 1268. *State v. Jones*, 2d Dist. Montgomery No. 19248, 2002-Ohio-4681, ¶ 10.

**{¶ 35}** Ponichtera immediately recognized the object protruding from Ohlert's pants pocket to be a hypodermic syringe. For the reasons he indicated in his testimony, he had probable cause to associate that object with criminal activity. Therefore, he was justified in seizing it.

## VI. Conclusion

**{¶ 36}** Both of Ohlert's assignments of error are overruled. The judgment of the trial court is Affirmed.

. . . . . . . . . . . . .

WELBAUM, J., concurs.

FROELICH, J., dissenting:

{¶ 37}  Uniformed Dayton Police Officer Michael Auricchio pulled his unmarked vehicle about 15-20 feet from the defendant.  He then asked the defendant and his companion if he could speak with them, and they went over to where he was standing.  He told them he needed to talk to them about a recent burglary and that another officer would be responding to the scene.

{¶ 38}  Sgt. Mark Ponichtera arrived three or four minutes later in uniform and a marked cruiser.  He asked the defendant for identification and the defendant provided his name.  Sgt. Ponichtera testified:

> * * * And at that point, you know, the area that they were in I decided to conduct a patdown.  And I asked him, I said "I would like to pat you down, you don't mind do you?"  And he said "no" and he actually raised his hands up in a manner such as this.  I am holding my hands up near my head.  In a manner like this as to submit or comply to my request. [T. 36]
>
> * * *
>
> After he raised his hands up at that point, you know, he was complying.  At that point, I asked him to actually interlace his fingers onto his head.  So in a more tactical manner.  He was going to submit to me.  I asked him to go ahead and do that.  So when he did that I began to pat him down. [T. 49]

{¶ 39}  When the prosecution relies upon a consent search theory, it has the burden of establishing by "clear and positive evidence" that the consent was voluntary. *State v. Posey*, 40

Ohio St.3d 420, 427, 534 N.E.2d 61 (1988); *Bumper v. North Carolina*, 391 U.S. 543, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968). Mere acquiescence to a claim of lawful authority cannot discharge this burden. *Bumper* at 548-549.

**{¶ 40}** The consent may be in the form of words, gesture, or conduct. *State v. Lane*, 2d Dist. Montgomery No. 21501, 2006-Ohio-6830, ¶ 39.

> Courts and commentators have recognized that "consent [to search] may be implied by the circumstances surrounding the search, by the person's prior actions or agreements, or by the person's failure to object to the search." *Kuras*, et al., Warrantless Searches and Seizures (2002), 90 Geo.L.J. 1130, 1172. "Thus, a search may be lawful even if the person giving consent does not recite the talismanic phrase: 'You have my permission to search.'" *United States v. Better-Janusch* (C.A. 2, 1981), 646 F.2d 759, 764. *See, also, United States v. Wesela* (C.A.7, 2000), 223 F.3d 656, 661 ("The district court reasonably concluded that Mrs. Wesela at the very least implicitly consented to the search."); *United States v. Gordon* (C.A.10, 1999), 173 F.3d 761, 766 (10th Cir.1999) ("Non-verbal conduct, considered with other factors, can constitute voluntary consent to search."); *United States v. Gilbert* (C.A.9, 1985), 774 F.2d 962, 964 (9th Cir.1985) ("Appellant's request that the officers obtain her clothing necessarily implied consent to enter the bedroom in which she said the clothing was located."); *United States v. Better-Janusch* (C.A.2, 1981), 646 F.2d 759, 764 ("Moreover, it is well settled that consent may be inferred from an individual's words, gestures, or conduct."); *United States v. Turbyfill* (C.A.8, 1975), 525 F.2d

57, 59 ("An invitation or consent to enter a house may be implied as well as expressed.").

*Lane* at ¶ 40.

**{¶ 41}** In *State v. Arnold*, 2d Dist. Montgomery No. 24195, 2011-Ohio-238, ¶ 20-22, we stated:

> Under applicable legal standards, the State has the burden of showing the validity of a warrantless search, because warrantless searches are "'per se unreasonable under the Fourth Amendment-subject only to a few specifically established and well delineated exceptions.'" *State v. Hilton*, Champaign App. No. 08-CA-18, 2009-Ohio-5744, ¶ 21-22, citing *City of Xenia v. Wallace* (1988), 37 Ohio St.3d 216, 218, 524 N.E.2d 889.

> Consent is one exception to the warrant requirement, and requires the State to show by "'clear and positive' evidence that the consent was 'freely and voluntarily' given." *State v. Posey* (1988), 40 Ohio St.3d 420, 427, 534 N.E.2d 61 (citations omitted). "A 'clear and positive' standard is not significantly different from the 'clear and convincing' standard of evidence, which is the amount of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the allegations to be proved. It is an intermediate standard of proof, being more than a preponderance of the evidence and less than evidence beyond a reasonable doubt." *State v. Ingram* (1992), 82 Ohio App.3d 341, 346, 612 N.E.2d 454 (citations omitted).

> In order to be valid, consent cannot be the product of coercion.

"'Consent' that is the product of official intimidation or harassment is not consent at all. Citizens do not forfeit their constitutional rights when they are coerced to comply with a request that they would prefer to refuse." *Florida v. Bostick* (1991), 501 U.S. 429, 438, 111 S.Ct. 2382, 115 L.Ed.2d 389. Furthermore, "the question whether a consent to a search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances." *Schneckloth v. Bustamonte* (1973), 412 U.S. 218, 227, 93 S.Ct. 2041, 2048, 36 L.Ed.2d 854.

{¶ 42} I do not believe the facts support a finding by "clear and positive" evidence that consent was "freely and voluntarily" given. A uniformed, armed officer asked the defendant to come over to him from 15-20 feet away and questioned him about his matching the description of a suspect in a recent burglary. Another officer, in uniform and a marked cruiser, arrived within three or four minutes, separated the defendant from his companion, questioned the defendant, and "decided to conduct a patdown." The officer asked if the defendant minded if he were patted down; the defendant raised his hands ("he was complying") and the officer asked him to "interlace his fingers" onto his head. "So in a more tactical manner. He was going to submit to me. I asked him to go ahead and do that. So when he did that I began to pat him down."

{¶ 43} Just as consent does not require the "talismanic phrase: 'You have my permission to search,'" *Better-Janusch*, 646 F.2d at 764, lack of consent, or mere acquiescence, does not require "No, you do not have my permission, but you're going to do it anyway, so what can I do about it, but let you proceed." And just as consent may be inferred from all the facts and circumstances, so can lack of consent or mere acquiescence.

**{¶ 44}** Perhaps as lawyers, judges, and professional law enforcement officials, we accept the legal conclusion that the defendant in this situation could have voiced his objections and that then, perhaps, the pat down search would not have occurred. But, with the totality of the facts before the court, a finding that the defendant, or any reasonable person in his position, was freely and voluntarily agreeing to be searched is to indulge in a fiction.

. . . . . . . . . .

Copies mailed to:

John J. Danish / Stephanie L. Cook
Andrew D. Sexton
Thaddeus Hoffmeister
Hon. Christopher D. Roberts