[Cite as *State v. Coleman*, 2014-Ohio-2091.]

IN THE COURT OF APPEALS FOR MONTGOMERY COUNTY, OHIO

STATE OF OHIO                    :

    Plaintiff-Appellee           :          C.A. CASE NO.    25924

v.                               :          T.C. NO.    12 CR 3390

LARON D. COLEMAN                 :          (Criminal appeal from
                                             Common Pleas Court)

    Defendant-Appellant          :

                                 :

· · · · · · · · · ·

**O P I N I O N**

Rendered on the    16th    day of     May    , 2014.

· · · · · · · · · ·

APRIL F. CAMPBELL, Atty. Reg. No. 0089541, Assistant Prosecuting Attorney, 301 W. Third Street, 5th Floor, Dayton, Ohio 45422
    Attorney for Plaintiff-Appellee

DANIEL A. PERRY, Atty. Reg. No. 0087548, 123 Boggs Lane, Cincinnati, Ohio 45246
    Attorney for Defendant-Appellant

· · · · · · · · · ·

DONOVAN, J.

    **{¶ 1}** This matter is before the Court on the Notice of Appeal of Laron

Darnell

Coleman, filed September 23, 2013. Coleman appeals from the trial court's September 18, 2013 judgment entry of conviction, issued following the denial of his motion to suppress, and subsequent no contest pleas, to one count of assault (police officer), in violation of R.C. 2903.13(A), a felony of the fourth degree, and one count of possession of heroin (less than one gram), in violation of R.C. 2925.11(A), a felony of the fifth degree. Coleman was sentenced to community control sanctions for a period of five years. We hereby affirm the judgment of the trial court.

{¶ 2} At Coleman's suppression hearing, Gordon L. Cairns testified that he is a narcotics detective with the Dayton Police Department, having been so employed for six months. Cairns stated that he has been employed by the Dayton Police Department for a total of 11 years. Prior to becoming a narcotics detective, Cairns stated that he was assigned to the GDPM Task Force, formerly known as DMHA. Cairns stated that on November 8, 2012, while working for the housing authority, he and Officer Guswiler, in their cruiser and in the uniform of the day, proceeded to 5044 Caliph Court to conduct a "knock and advise" based upon complaints the task force received regarding "possible drug sales and illegal activity going on in that particular location." According to Cairns, the address is in "a multiple unit building, with its own individual address of 5044." He stated that each unit has its own front door, with "steps that come down off a very small concrete porch." Cairns stated that Officers Coleman and Mullins also responded to the same address, and that Officer Coleman advised him and Guswiler by radio that "there were two individuals standing on the steps of 5044 Caliph," and that one was wearing red and one was wearing a darker color. As Cairns and Guswiler approached the address, they observed two individuals "now walking away from that location, through the parking lot, * * * ."

{¶ 3}   Cairns stated that Coleman was wearing the darker colored clothing, and that he and Officer Coleman approached him on foot, while Guswiler and Mullins approached the other individual.   Cairns stated that "the housing projects are all private property owned by DMHA, so we always want to identify * * * people on the property and see, one, if they live on the property.   And then if they don't, see if they're trespassing or if there's further that goes on."   Cairns testified, "So we approach Mr. Coleman and I just say, you know, 'You got anything on you,' knowing that we've had complaints of drug activity from there in the past and also the particular occasion over there that particular day."   Following Cairns' question, Cairns testified, "Laron Coleman turns and basically puts his hands in the air. From my 11 years of experience, that normally indicates, 'Go ahead and search me. * * * Pat me down.['] So I begin just a <u>Terry</u> pat down just to make sure there's no weapons before we begin our investigation into who these people are and why they're at that particular location."   Cairns stated that Coleman "turned his back towards me, and we normally, when we conduct our pat downs we always stand at the rear of the person when we do those." Cairns stated that in the course of his police work he has approached other individuals in the street, and that "[m]any, many times," he has observed conduct similar to that exhibited by Coleman, namely the raising of hands upon approach by a police officer.   Cairns testified that he interpreted Coleman's conduct as consent to the pat down.

{¶ 4}   Cairns testified as follows:

> I began a pat down on him.   The typical way I always do, I start on the right side and I start from the top.   At no time was I told by Laron Coleman, "What are you doing?   Stop.   Don't do any that sort of thing," and I begin patting him down.    When I get to his right pants pocket, I

immediately feel cellophane bags with something in them.

From my experience and training I know that's normally the way drugs are carried in baggies in a pocket. I just pat the bags, you know, I feel it from the outside, and I just say, "What is that?" And he indicates that it[']s marijuana.

{¶ 5} Cairns stated that Coleman was not under arrest in the course of the pat down, that it was not Cairns' intention to take him into custody, and that he did not say or do anything to convey to Coleman that he was not free to leave. When asked if he knew what the items were in Coleman's pocket, Cairns stated that "[i]t felt immediately like drugs." The following exchange occurred:

Q. And what happened after he indicated that it was just marijuana in the pocket?

A. He indicated that it was marijuana, at which time Officer Coleman grabbed a hold of Laron Coleman's left arm and as he did that Laron Coleman put his right hand into his right pocket, the same pocket I had just felt.

Q. And what happened after that?

A. I grabbed a hold of his right hand and basically at this point he's now indicating he has illegal drugs upon him. I didn't want him to destroy those drugs or be something else in there that could be even more hazardous to us. So I grabbed a hold of his right hand and try to prevent him from doing what he's going to get out of the pocket or do into the pocket.

Q. And what happened after you grabbed his right hand?

A. I grabbed his right hand and he tenses up and I have to basically try to force his hand from his pocket. He pulls his hand out of his pocket and at the same time as he pulls his hand - - his right hand out of his right pocket he turns in a counterclockwise motion, just to kind of set it up; I'm to - - I'm on the right side and Officer Coleman is on my left and Laron Coleman would be at this point standing directly in front of us facing away from us.

He pulls the right hand out of his pocket and simultaneously breaks free of my grip on his right hand and does a counterclockwise spinning motion and then with that right hand punches Officer Coleman directly in the chest.

Q. And what happens after that?

A. Officer Coleman is able to keep a hold of his arm, and basically at that point I pull out my taser and go to fire a taser as Mister - - as Laron is trying to pull away from Officer Coleman.

Q. And what happens next?

A. I fire the taser, but the probes malfunctioned or something, they did not come out, and Laron Coleman pulls from Officer Coleman's grip and he begins to flee north through the parking lot.

A. And what happens next?

Q. We pursue him. There's probably, I would say, 50 to 100 feet, through this parking lot. We get to the end of the building and just to kind of set it up. We are about the third apartment in at this point in the parking lot

and he gets to the end of the building, in the grassy area, and we are able to push him to the ground, and then at this point we were going to attempt to take him into custody for assault on a police officer.

\* \* \*

Q. And what happens after you detain Mr. Coleman?

A. Once we eventually get him detained, we pick him up and then right on that area where a semi-lengthy struggle had just previously occurred, take him into custody; there are two tasers laying on the ground with taser cartridges, and also where his arms were, two bags, one of marijuana, one of suspected heroin.

Q. \* \* \* And was Mr. Coleman searched - - or was - -at that point was Mr. Laron Coleman under arrest?

A. He was.

Q. And what was he under arrest for, if you recall?

A. Assault on a police officer at that point and then once we seen that one of those baggies contained what's suspected as being heroin, possession of drugs.

Q. And at that point is he placed into a cruiser?

A. Yes, he is.

Q. Before he's placed in a cruiser, is he searched again?

A. He is.

Q. Did you find anything during that search?

A. Yeah. Another bag of actually powdered heroin was found on his person, in his left front pants pockets.

{¶ 6} Cairns stated that he and Guswiler took Coleman to the hospital from the scene to treat injuries he received in the scuffle. Cairns stated that Coleman was not advised of his rights and that the officers did not question him en route to the hospital, but that Coleman made statements. The following exchange occurred:

Q. And what did Mr. Coleman say?

A. He just made the mistake - - the statement that he couldn't believe this happened, and then - - that he didn't feel anything during the encounter.

Q. And after he made that statement, did you or Officer Guswiler question him?

A. No. Officer Guswiler, he made the statement, * * * "It must have been all that crack that you," or "it must have your crack you smoked." (Sic).

Q. And did Mr. Laron Coleman make any statements or anything in response to that?

A. He did. He made the statement, "that was not crack. That was seven grams of heroin."

Q. * * * And other than this exchange, was there any other questioning of Mr. Coleman?

A. There was not.

Cairns stated that Coleman was taken to jail upon release from the hospital.

{¶ 7} On cross-examination, Cairns stated that the officers arrived at 5044 Caliph Court at 11:00 a.m. He stated that the officers did not have a search warrant for the subject address. Cairns stated that three officers and a supervisor routinely conduct knock and advises together. Cairns acknowledged that Officer Coleman did not indicate via radio that the individuals he observed were engaged in a drug deal, and he further acknowledged that the individuals could have been residents of different apartments within the complex. The following exchange occurred:

Q. * * * And so you walk up with the intent to investigate?

A. Yes.

Q. * * * That means ask questions?

A. Yes.

Q. * * * That means, "Who are you? Show me some identification."

A. Correct.

* * *

Q. * * * Is that the only people in the parking lot at the time?

A. It is.

Q. * * * So you don't go to 5044 Caliph Court, you don't just go up to there; you instead stop these two individuals in the parking lot?

A. Correct.

Q. Did you see any bulge on them that would indicate the presence of a weapon?

A. No.

Q. Did you see them engage in any activity that looked like they

were casing a joint, looking to rob something?

    A. No.

    Q. You didn't see them looking into cars to see - - looking at stereos

       or anything like that?

    A. Nope.

    Q. No objective indication that any criminal activity was afoot?

    A. Besides coming from the location of a drug complaint.

    Q. Well, of a suspected drug house that you had no warrant for, right?

    A. Correct.

    Q. And that you had, on your own, you had no independent knowledge other than what the report from the management was?

    A. That is correct.

{¶ 8}    On redirect, the following exchange occurred:

    Q. If Mr. Coleman would have simply said, "I have nothing on me. I don't want to talk to you." Would you have pursued him?

    A. No.

    * * *

    Q. And this pat down of Mr. Coleman, just so the record is clear. Your testimony today, the only reason you patted him down was because you believed he was consenting to a pat down?

    A. That is correct

Q. Prior to the pat down you didn't think he was armed or anything like that?

A. I had no indication that he was, just, you know, due to the area, and the complaints from that area we wanted to verify for safety that there was no weapons involved.

{¶ 9} In its "Decision, Order and Entry Sustaining in part and Overruling in part Defendant's Motion to Suppress," the trial court determined as follows:

In the case at bar, Cairns initiated a consensual encounter with Defendant. Cairns credibly testified that he approached Defendant and that Defendant consented to a pat-down. Defendant was not in custody when Cairns asked what he felt in Defendant's pocket. Cairns did not reach into the pocket until after Defendant shoved his hand in it, broke free and punched another officer. Until the point that Defendant allegedly assaulted the officer and ran, the encounter between Cairns and Defendant was consensual. Thus, the pat-down and any statements made by Defendant during it are not subject to suppression.

The court concluded that "the officer's remark about Defendant smoking crack was likely to elicit an incriminating response. Thus, Defendant's statement in response to Officer Gusweiler's (sic) comment is hereby suppressed."

{¶ 10} Coleman asserts one assignment of error herein as follows:

"THE TRIAL COURT ERRED IN FAILING TO GRANT DEFENDANT'S MOTION TO SUPPRESS IN IT'S (sic) TOTALITY AS DEFENDANT WAS INITIALLY SUBJECT TO A WRONGFUL DETENTION, AND THEREFORE DEFENDANT'S

CONSENT TO BE SEARCHED WAS INVOLUNTARY."

{¶ 11} As this Court has previously noted:

In regards to a motion to suppress, "the trial court assumes the role of trier of facts and is in the best position to resolve questions of fact and evaluate the credibility of witnesses." *State v. Hopfer*, 112 Ohio App.3d 521, 548, 679 N.E.2d 321 (2d Dist.1996), quoting *State v. Venham*, 96 Ohio App.3d 649, 653, 645 N.E.2d 831 (4th Dist.1994). The court of appeals must accept the trial court's findings of fact if they are supported by competent, credible evidence in the record. *State v. Isaac*, 2d Dist. Montgomery No. 20662, 2005-Ohio-3733, citing *State v. Retherford*, 93 Ohio App.3d 586, 639 N.E.2d 498 (2d Dist.1994). Accepting those facts as true, the appellate court must then determine, as a matter of law and without deference to the trial court's legal conclusion, whether the applicable legal standard is satisfied. *Id*.

*State v. Ginn*, 2d Dist. Montgomery No. 25325, 2013-Ohio-1692, ¶ 12.

{¶ 12} Coleman asserts that the trial court erred in denying his motion to suppress since he "was initially subject to a wrongful detention by the City of Dayton Police, and therefore Defendant's consent to a search of his person was involuntary." Coleman asserts that Cairns' "intent was not to investigate the complaint [of drug-related activity at the Caliph Court address] but to single out [Coleman] and wrongfully detain him." According to Coleman, if "Officer Cairns['] intent was to investigate he would have asked the Defendant his name, would have asked for ID, or would have asked a variety of other questions inherent in any investigation." Coleman asserts, under "the totality of the

circumstances, it is clear that the Defendant was in 'custody' and subject to custodial interrogation and was not free to leave at this moment." Coleman argues that "Officer Cairns' act of making the statement 'got anything on you,' would lead a reasonable person to believe that he was not free to leave, and therefore amounts to an illegal detention of the Defendant." Coleman emphasizes that he "was not suspected of a crime," and that even if his conduct of raising his arms and turning around "could be considered as consent to be searched, as the Defendant was illegally detained, the consent would be considered involuntary * * *."

{¶ 13} Coleman relies upon *State v. Spain*, 10th Dist. Franklin No. 10AP-319, 2011-Ohio-322, which he argues is analogous to the matter herein. In *Spain*, after the Tenth District remanded the matter for the trial court to determine if Spain consented to be searched, while stopped for jaywalking by Officers Kane and Radich, in a "'high narcotic' area," the trial court concluded that Spain's "consent was involuntary because it was obtained during an illegal detention." *Id*., ¶ 2, 17. At the initial suppression hearing, Officer Radich testified to the following events upon the stop of Spain:

> * * * Radich asked appellee if he had any drugs and if he had any
>
> prior arrests. Appellee told the officers that he did not have any drugs, but
>
> he admitted that he had prior drug-related arrests. Radich asked if appellee
>
> would consent to be searched, and appellee said yes. After a brief discussion
>
> with Kane, Radich repeated his request to search appellee, and appellee again
>
> agreed. Radich conducted the search and found crack cocaine on appellee.
>
> Afterward, Appellee admitted that he also had a crack pipe, and Radich

retrieved that item, too. Appellee was arrested for drug possession, but he was not cited for jaywalking.

After testifying on direct examination that appellee was free to leave at the time he consented to the search, Radich conceded on cross-examination that appellee was, in fact, not free to leave. Also on cross-examination, Radich testified that he did not feel threatened by appellee, and he was not expecting to find drugs or guns during his search of appellee. *Id.*, ¶ 2-3.

{¶ 14} On the State's appeal following the remand, the Tenth District determined as follows:

We have already concluded that the fact that appellee was jaywalking did not provide a basis for Radich to prolong the stop he made for that offense in order to conduct a search. [*State v. Spain*, 10th Dist. Franklin No. 09AP-331, 2009-Ohio-6664, ¶ 21]. Stated another way, the search was unrelated to appellee's jaywalking offense. When an officer prolongs a detention to conduct a search, and the search is not related to the original purpose for the stop, the prolonged detention constitutes an illegal seizure if the officer does not have "articulable facts giving rise to a suspicion of some illegal activity." *State v. Robinette*, 80 Ohio St.3d 234, 685 N.E.2d 762, 1997-Ohio-343, paragraph one of the syllabus. There is nothing in the record to establish that Radich had articulable facts allowing him to suspect that appellee was involved in some illegal activity beyond jaywalking. In fact, Radich testified that he did not feel threatened by appellee. Thus,

Radich had no basis to prolong appellee's detention for a search, and the trial court correctly concluded that appellee was being illegally detained when he consented to be searched.

* * *

Radich testified on cross-examination that appellee was not free to leave when he consented to be searched * * * . Because appellee consented to be searched under circumstances where a reasonable person would not believe that he was free to leave, the trial court had a proper basis for concluding that appellee's consent was not voluntary. *State v. Spain*, 10th Dist. Franklin No. 10AP-319, 2011-Ohio-322, ¶ 18, 20.

{¶ 15} The State responds that Coleman's "initial encounter with police was consensual. This is because during the initial encounter, there was no physical force or show of authority demonstrated. Laron Coleman and the other individual were not summoned to the officer's presence; rather the officers approached them." The State asserts that there "is nothing in the record that suggests the officers' presence was in any way threatening; there was no display of a weapon, of physical touching in the initial encounter."

The State asserts that Cairns' question to Coleman "was a mere request for information, one that was reasonable considering the surrounding circumstances: [t]he officers were at the housing projects specifically because of a complaint from management about possible drug sales and illegal activity from a particular address," namely the "same address the officers observed Coleman and his companion depart from." Finally, the State asserts that there was no show of force until Officer Coleman grabbed Coleman's arm, which occurred "after

Coleman gave his physical manifestation of consent, consent that Coleman does not now challenge," and after "Coleman admitted that the cellophane baggies in his pants contained marijuana." The State asserts that Coleman's reliance upon *Spain* is misplaced and directs our attention in part to *State v. Ohlert*, 2d Dist. Montgomery No. 25389, 2013-Ohio-2579.

{¶ 16} As this Court noted in *Ohlert*:

A person is seized, for Fourth Amendment purposes, "only when, by means of physical force or a show of authority, his freedom of movement is restrained." *U.S. v. Mendenhall*, 446 U.S. 544, 553, 100 S.Ct. 1870, 64 L.E.d2d 497 (1980). "Only when such restraint is imposed is there any foundation whatever for invoking constitutional safeguards." *Id*.

"[A] person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *Id*. at 554.

"Examples of circumstances that might indicate a seizure, even where the person did not attempt to leave, would be the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled. * * *. *In the absence of some such evidence, otherwise inoffensive contact between a member of the public and the police cannot, as a matter of law, amount to a seizure of that person*." *Id*., at 554-555. (Emphasis added).

*Ohlert*, ¶ 19-21.

{¶ 17} In *State v. Ingram*, 82 Ohio App.3d 341, 612 N.E. 2d 454 (2d Dist. 1992), this Court determined that Ingram's encounter with police officers constituted a seizure where two officers approached him on private property, in uniform and carrying weapons. *Id*., at ¶ 2. The evidence relating to the show of authority also included the fact that Ingram, who was wearing blue shorts, a dark T-shirt, and a ball cap, was sitting on a "small railed porch, waiting for someone; his way was blocked so that he could not exit to the street." *Id*., 345. The officers stood close to Ingram, and one officer asked Ingram his "name, date of birth, Social Security number, and he answered accurately. Ingram then asked why they wanted to know; [the officer] responded that they had been dispatched there because someone [wearing light blue shorts, a dark T-shirt, and ball cap] was selling crack." *Id*., 344. Ingram "was not told that he had the right to refuse to answer questions." *Id.*, 345. The officer testified that Ingram "threw up his hand and stood up and says, 'Not me man, I don't do that stuff. Search me, man.'" *Id*., 344. One officer patted Ingram down and the other one asked for Ingram's hat. The officer "found a rock in the lining of the cap, which later tested positive for cocaine." *Id*., 344. The trial court determined "that the consent, where the officers 'accost[ed] him in such a manner as to precipitate his volunteering to let them search him, [was] not a voluntary action under the circumstances * * * .'" *Id*., 347. This Court noted as follows:

> While this record may have supported a contrary finding that Ingram
> was not seized, in considering the totality of the circumstances, and keeping
> in mind the deference that an appellate court must give to a trial court's

determination of the credibility of the witnesses and the proper construction to be placed upon testimony that may be subject to interpretation, especially where the record is somewhat opaque, we cannot say that the finding that Ingram was not free to leave, and therefore was seized, is clearly erroneous. *Id.*, 345-46.

**{¶ 18}** Regarding whether or not Ingram freely and voluntarily consented to the search of his person, this Court noted as follows:

The state bears the burden of proving that the consent was, in fact, freely and voluntarily given. This burden cannot be discharged by showing merely an acquiescence to a claim of lawful authority. *Bumper v. North Carolina* (1968), 391 U.S. 543, 549, 88 S.Ct. 1788, 1792, 20 L.Ed.2d 797, 802. Further, the degree of proof required to show that the consent was not contaminated by duress, coercion, or trickery is proof by "clear and convincing evidence." A "clear and positive" standard is not significantly different from the "clear and convincing" standard of evidence, which is the amount of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the allegations to be proved. It is an intermediate standard of proof, being more than a preponderance of the evidence and less than evidence beyond a reasonable doubt. * * *

The voluntariness of the consent is a question of fact to be determined from the totality of the circumstances. *Schneckloth v. Bustamonte* (1973), 412 U.S. 218, 227, 93 S.Ct. 2041, 2048, 36 L.Ed.2d 854, 862. "But the

Fourth and Fourteenth Amendments require that a consent not be coerced, by explicit or implicit means, by implied threat or covert force. For, no matter how subtly the coercion was applied, the resulting 'consent' would be no more than a pretext for the unjustified police intrusion against which the Fourth Amendment is directed." *Id*. at 228, 93 S.Ct. at 2048, 36 L.Ed.2d at 863. *Ingram*, 346-47.

{¶ 19} The issue of consent in this case is not free from difficulty. The trial court concluded that Officer Cairns testified credibly that Coleman "consented to a pat down." The trial court's opinion does not include any analysis of *Bumper v. North Carolina*, 391 U.S. 543, which emphasizes the State's burden on the issue of consent "cannot be discharged by showing no more than acquiescence to a claim of lawful authority." The State would have us infer from certain facts that Coleman's non-verbal raising of his arms demonstrates an intention to consent to a pat down, not acquiescence. An equally plausible inference from Coleman's non-verbal conduct is that he submitted to what he viewed as the intimidating presence of four armed and uniformed officers, one of whom just asked an accusatory question. *See generally,* Froelich, J., dissenting in *Ohlert.*

{¶ 20} However, we need not decide the issues of wrongful detention nor consent to a pat down, since the drugs that are the subject of this indictment were discovered in plain view, under Coleman's person after an assault upon a police officer. "Under the plain-view exception, 'police may seize an article when its incriminating nature is immediately apparent to an officer who comes in contact with the item through lawful activity.' [*State v. Pounds*, 2d Dist. Montgomery No. 21257, 2006-Ohio-3040, ¶ 19], citing

*Coolidge v. New Hampshire*, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971)." *State v. Thompson*, 2d Dist. Montgomery No. 25658, 2013-Ohio-4825, ¶ 13, *appeal not accepted for review*, 138 Ohio St.3d 1449, 2014-Ohio-1182, 5 N.E.3d 667.   Any additional drugs which were the subject of this indictment were found upon Coleman's person after a search incident to arrest for assault (peace officer).   Search incident to arrest is another exception to the warrant requirement "which allows officers to conduct a search that includes an arrestee's person and the area within the arrestee's immediate control. * * *  This exception 'derives from interests in officer safety and evidence preservation that are typically implicated in arrest situations.' * * * ."   *State v. Smith*, 124 Ohio St.3d 163, 2009-Ohio-6426, 920 N.E.2d 949, ¶ 11.

**{¶ 21}**   Accordingly, we affirm.

. . . . . . . .

FROELICH, P.J. and WELBAUM, J., concur.

Copies mailed to:

April F. Campbell
Daniel A. Perry
Hon. Barbara P. Gorman